[No. S155242. Aug. 17, 2009.]

RUSSELL CHRISTOFF, Plaintiff and Respondent, v.
NESTLÉ USA, INC., Defendant and Appellant.

COUNSEL

Horvitz & Levy, David M. Axelrad, Jeremy B. Rosen, John A. Taylor, Jr.; Heller & Edwards, Lawrence E. Heller and Shula R. Barash for Defendant and Appellant.

Davis Wright Tremaine, Kelli L. Sager, Rochelle L. Wilcox, Kevin L. Vick; Karlene Goller; Jonathan Donellan; Hallie Michelena; David Tomlin, Laura Malone; Thomas W. Newton; Peter Scheer; Lucy Dalglish and Gregg Leslie for Los Angeles Times Communications LLC, The Hearst Corporation, Viacom, Inc., The Associated Press, The California Newspaper Publishers Association, The California First Amendment Coalition, The Reporters Committee for Freedom of the Press and The Association of Alternative Newsweeklies as Amici Curiae on behalf of Defendant and Appellant.

Loeb & Loeb, Douglas E. Mirell and W. Allan Edmiston for Motion Picture Association of America, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Colin C. Claxon, Colin C. Claxon; Mayer & Glassman Law Corporation, Robert David Mayer; Kibre & Horwitz, Eric G. Stockel; and David J. Franklyn for Plaintiff and Respondent.

Duncan W. Crabtree-Ireland and Danielle S. Van Lier for Screen Actors Guild, Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

Reich, Adell & Cvitan, Laurence S. Zakson and William Y. Sheh for American Federation of Television and Radio Artists, AFL-CIO, as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MORENO, J.**—In 1986, professional model Russell Christoff was paid $250 to pose for a photograph to be used in Canada on a label for bricks of coffee. Sixteen years later, Christoff saw his face on a jar of Taster's Choice instant coffee in the United States and discovered that his image had been used without his consent on millions of labels sold internationally for the preceding five years. Christoff filed the present action for appropriation of his likeness six years after Nestlé USA, Inc. (Nestlé), began using his image on the Taster's Choice label but less than a year after his discovery.

The trial court applied a two-year statute of limitations and instructed the jury to determine under the discovery rule whether Christoff knew or should have known earlier that Nestlé had used his image. The jury found that Christoff did not know, and should not reasonably have suspected prior to seeing the jar, that his image was being used without his consent and awarded him more than $15 million in damages.

The Court of Appeal reversed, holding that under the single-publication rule, because Christoff had not filed his lawsuit within two years after Nestlé first "published" the label, his cause of action is barred by the statute of limitations unless, on remand, the trier of fact finds that Nestlé had hindered Christoff's discovery of the use of his photograph, or that the label had been "republished." We granted review.

We agree with the Court of Appeal that the judgment must be reversed because the trial court erroneously ruled that the single-publication rule does not apply to claims for appropriation of likeness. But we do not agree with the Court of Appeal that this means that Christoff's action necessarily is barred by the statute of limitations unless he can show on remand that Nestlé had hindered his discovery of the use of his photograph, or that the label had been "republished." The Court of Appeal's ruling presupposes that Nestlé's various uses of Christoff's likeness, including its production of the product label for a five-year period, necessarily constituted a "single publication" within the meaning of the single-publication rule. Because the parties were prevented by the trial court's erroneous legal ruling from developing a record concerning whether the single-publication rule applied, we remand the matter for further proceedings.

## FACTS[1]

In 1986, Russell Christoff, an actor and professional model, posed gazing at a cup of coffee, as if he enjoyed the aroma. The photo shoot was arranged by Nestlé Canada.[2] Christoff was paid $250 for a two-hour photo shoot and received a contract providing that if Nestlé Canada used the picture on a label it was designing for a brick of Taster's Choice coffee, Christoff would be paid $2,000 plus an agency commission.[3] The price for any other use of Christoff's image would require further negotiations. Without informing Christoff, or paying him according to the terms of the contract, Nestlé Canada used Christoff's image on the coffee brick.

Eleven years later, in 1997, Nestlé decided to redesign its label for Taster's Choice instant coffee, which, for three decades, had prominently featured a

---

[1] The statement of facts and procedural history is based largely on the opinion of the Court of Appeal.

[2] Nestlé Canada is a corporation affiliated with but separate from respondent and is not a party to this appeal.

[3] From 1987 to 2000, Christoff's average income from modeling and acting was about $50,000 a year. At the time of trial in 2005, Christoff worked as an elementary school teacher in addition to modeling and acting.

"taster," that is a person peering into a cup of coffee. The high resolution artwork of the original "taster" used to produce the existing label had been lost. Nestlé searched without success for other high resolution artwork of the original "taster," but found instead the photograph of Christoff that Nestlé Canada had used on the coffee brick, which satisfied the requirements.

Nestlé decided to use Christoff's image because he looked "distinguished" and resembled the original "taster." Christoff's photograph was "youthened" to make him appear younger and more similar to the original "taster." Nestlé believed that it had authority to use Christoff's image because it had been widely used in Canada. Nestlé never investigated the scope of the consent and never asked Christoff if he consented to the use of his image. Christoff's image was used in the redesigned Taster's Choice label beginning in 1998. The redesigned label was used on several different Taster's Choice jars, including regular coffee, decaffeinated, and various flavors. Labels bearing Christoff's image also were produced in different languages and placed on jars of coffee to be sold internationally. For the label used in Mexico, Christoff's image was altered to add sideburns and darken his complexion. Images of jars of coffee bearing Christoff's image appeared in Nestlé's multiple advertising campaigns for Taster's Choice, including transit ads, coupons in newspapers, magazine advertisements, and Internet advertisements.

In 2002, a person standing in line with Christoff at a hardware store remarked that he "look[ed] like the guy on my coffee jar." A month or so later, on June 4, 2002, Christoff saw a jar of Taster's Choice instant coffee on a store shelf and, for the first time, recognized his photograph on the label. He purchased the jar of coffee and called his agent.

In 2003, Nestlé again redesigned its label using another model, James Vaccaro, as the "taster." Vaccaro was paid $150,000 for the use of his image for 10 years. The new label started circulating in May 2003, but jars of Taster's Choice with Christoff's image were still in Nestlé's inventory and could have been shipped to retailers.

### Procedural Background

In 2003, Christoff sued Nestlé, alleging causes of action for unauthorized commercial use of another's likeness in violation of Civil Code section 3344,[4] common law appropriation of likeness, quantum meruit (initially

---

[4] Civil Code section 3344, subdivision (a), states, in pertinent part: "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting

labeled "quasi-contract"), and unjust enrichment. The trial court denied Nestlé's motion for summary judgment based on the statute of limitations, ruling that the Uniform Single Publication Act as codified in Civil Code section 3425.3 (hereafter section 3425.3), which states that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine,"[5] did not apply to Christoff's claims because they were not "based on defamation." The trial court reasoned that the single-publication rule "was developed in the common law to avoid the problems that mass publication of books and newspapers created for the tort of defamation." The court explained that Christoff's "claim is not defamation-like because he is not alleging that he suffered damages from offensive communications," but rather his "claim arises from the alleged unauthorized use of his likeness, which is protected by his right of publicity." Christoff "does not claim that this use was offensive, but instead seeks compensation for the defendant's use of his likeness in advertising."

The court applied a two-year statute of limitations under Code of Civil Procedure section 339 and instructed the jury that because Christoff filed his complaint on February 7, 2003, he could "claim damages that took place at any time on or after February 7, 2001." The court further instructed the jury that "the rule of delayed discovery" would apply and Christoff could "also seek damages that took place from the time Nestlé USA first used his image" if Christoff proved that "prior to his discovery of the facts he did not previously suspect, or should have suspected, that his photograph was on the Taster's Choice label."[6] The trial court denied Nestlé's motion for summary

purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof. . . ."

[5] Section 3425.3 states: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."

[6] The court instructed the jury: "The Court has determined that the statute of limitations for Mr. Christoff's claims under Civil Code section 3344 is two years. Mr. Christoff filed his Complaint on February 7, 2003, meaning that he may claim damages that took place at any time on or after February 7, 2001. [¶] In addition, if you find that the rule of delayed discovery applies, then Mr. Christoff may also seek damages that took place from the time Nestlé USA first used his image. In order to establish a delayed discovery Mr. Christoff bears the burden of proving that: (a) prior to his discovery of the facts he did not previously suspect, or should have suspected, that his photograph was on the Taster's Choice label; and (b) he had no notice or information of circumstances which would have put a reasonable person on inquiry despite the exercise of reasonable diligence that his photograph was on the Taster's Choice label."

adjudication, in which it asserted that there was no evidence it knowingly used Christoff's photograph without his consent.

At trial, Nestlé vigorously objected to the testimony of Christoff's damage expert, Peter Sealy, that the icon on the Taster's Choice label was responsible for 5 to 15 percent of Nestlé's profits from selling Taster's Choice instant coffee. This testimony was the basis for Christoff's argument that he was entitled to 10 percent of Nestlé's profits from the sale of Taster's Choice instant coffee. Christoff's accounting expert testified that, during the six-year period Nestlé used Christoff's likeness, Nestlé's total profits from Taster's Choice were $531,018,000 and, based on Sealy's testimony, Christoff was entitled to $53,101,800.

Joseph Hunter, a former partner at Ford Models, a prominent modeling agency, also testified as an expert for Christoff. According to Hunter, a model generally charges a day rate for a photo shoot and a usage fee for different uses such as packaging, billboards, and transit. He valued the use of Christoff's photograph for a six-year period at $1,475,000. In addition to the six-year time period, Hunter assumed that the photo was used "in virtually all kinds of media that existed." He acknowledged that Vaccaro received $150,000 for the use of his image for a 10-year period but explained that $150,000 is a very low fee.

At the close of Christoff's case, the court granted Nestlé's nonsuit motion on the issue of punitive damages. The court found no evidence of malice.

The jury concluded as follows: (1) Nestlé knowingly used Christoff's photograph or likeness on the Taster's Choice labels for commercial purposes without Christoff's consent; (2) prior to 2002, Christoff did not know and should not have known or reasonably suspected that his photograph was being used for commercial purposes; (3) Christoff suffered $330,000 in actual damages; (4) the profits attributable to the use of Christoff's photograph or likeness were $15,305,850; (5) the damages for the common law appropriation claim were $330,000 and for the quantum meruit claim were $15,635,850. The trial court subsequently granted Christoff's motion for attorney fees. Nestlé appealed from the judgment and the order awarding costs and attorney fees.

The Court of Appeal reversed the judgment and remanded the case for a new trial, ruling that the single-publication rule codified in section 3425.3 applied to the tort of appropriation of likeness. The court applied our decision in *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1245 [7 Cal.Rptr.3d 576,

80 P.3d 676] (hereafter *Shively*), which held that the defamation cause of action in that case accrued upon the " 'first general distribution of the publication to the public,' " and reasoned that whether the discovery rule delayed the accrual of the cause of action depended upon whether Nestlé hindered Christoff's discovery of the use of his photograph. The court directed that, in a retrial, the trier of fact must consider whether Nestlé hindered Christoff's discovery of the use of his photograph and "whether any republications occurred within the two-year limitations period."[7]

## DISCUSSION

The Court of Appeal ruled that the single-publication rule as codified in section 3425.3 applied to Christoff's cause of action for unauthorized commercial use of his likeness and, thus, the statute of limitations was triggered when Nestlé first "published" the label and expired two years later unless accrual of Christoff's action was delayed by the delayed discovery rule or the statute of limitations began anew because Nestlé "republished" the label. We agree that, in general, the single-publication rule as codified in section 3425.3 applies to causes of action for unauthorized commercial use of likeness, but in order to determine when the statute of limitations was triggered for Christoff's action, we must decide whether Nestlé's unauthorized use of Christoff's image, including its production of the label, constituted a "single publication" within the meaning of the single-publication rule. As explained below, the record on appeal is insufficient to permit this court to answer this question.

■ The Court of Appeal was correct that the single-publication rule as codified in section 3425.3 applies, in general, to a cause of action for unauthorized commercial use of likeness. The language of section 3425.3 is quite broad and applies by its terms to any action "for libel or slander or invasion of privacy *or any other tort* founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." (Italics added.) "When the Legislature inserted the clause *'or any other tort'* it is presumed to have meant exactly what it said." (*Strick v. Superior Court* (1983) 143 Cal.App.3d 916, 924 [192 Cal.Rptr. 314].) The rule announced in section 3425.3 is " 'not aimed at the particular tort alleged, but rather at the manner in which the tort is executed.' " (*Strick*, at p. 924; see *Long v. Walt Disney Co.*

---

[7] The Court of Appeal further ruled that the two-year statute of limitations set forth in Code of Civil Procedure section 339 applied, that Nestlé knowingly used Christoff's likeness within the meaning of Civil Code section 3344, that the award of more than $15 million for profits attributable to the use of Christoff's photograph was not supported by substantial evidence, and that the award of more than $15 million for quantum meruit must be reversed.

(2004) 116 Cal.App.4th 868, 871 [10 Cal.Rptr.3d 836] ["courts in California and other jurisdictions have interpreted the uniform act expansively"].) We agree with the Court of Appeal, therefore, that the trial court erred in ruling that section 3425.3 did not apply to Christoff's claims because they were not "based on defamation."

The Court of Appeal then turned to our decision in *Shively*, which held that a cause of action that is governed by the single-publication rule accrues "from the date of the ' "first general distribution of the publication to the public." ' (*Shively, supra,* 31 Cal.4th at p. 1245.)" Christoff argues, inter alia, that the single-publication rule does not apply to Nestlé's printing of its product label because it is not "a single 'publication,' a one-time occurrence," such as a newspaper, book, magazine, or television broadcast. Nestlé counters that "the rule was intended to apply to multiple printings of the same publication." The question is more subtle than either of these positions would suggest.

█  In order to apply the single-publication rule, a court first must identify what constitutes a "single integrated publication" (*Belli v. Roberts Brothers Furs* (1966) 240 Cal.App.2d 284, 289 [49 Cal.Rptr. 625]) within the meaning of the rule, such as the printing and distribution of a particular issue of a newspaper, magazine, or book. Whether the printing of a product label over a five-year period constitutes a single integrated publication within the meaning of the single-publication rule is an issue of first impression in this state. In addition to producing the product label, Nestlé also used Christoff's likeness in other forms, including transit ads, coupons in newspapers, magazine advertisements, and Internet advertisements. This raises questions whether each of these activities constituted a "single integrated publication," whether the entire advertising campaign should be considered a "single integrated publication," or whether Nestlé's first use of Christoff's image triggered the running of the statute of limitations for all subsequent uses in whatever form. These are important questions, and there is little authority to turn to for guidance.

The single-publication rule was created to address the problem that arose with the advent of mass communication from the general rule in defamation cases that "each time the defamatory statement is communicated to a third person . . . the statement is said to have been 'published,' " giving rise to a separate cause of action. (*Shively, supra,* 31 Cal.4th at p. 1242.) "[T]he principle that each communication of a defamatory remark to a new audience constitutes a separate 'publication,' giving rise to a separate cause of action, led to the conclusion that each sale or delivery of a copy of a newspaper or book containing a defamation also constitutes a separate publication of the defamation to a new audience, giving rise to a separate cause of action for

defamation. [Citations.] This conclusion had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book." (*Id.* at pp. 1243–1244.) "As one commentator stated: '. . . Regardless of whether it was an appropriate rule in 1849 it is horrendous today when magazine readers and radio and TV audiences may total many millions.' [Citation.]" (*Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 891, fn. 2 [70 Cal.Rptr.3d 178, 173 P.3d 1004].)

The common law rule that each "publication" of a defamatory statement created a new cause of action "also had the potential to disturb the repose that the statute of limitations ordinarily would afford, because a new publication of the defamation could occur if a copy of the newspaper or book were preserved for many years and then came into the hands of a new reader . . . . The statute of limitations could be tolled indefinitely, perhaps forever, under this approach." (*Shively, supra,* 31 Cal.4th 1230, 1244.) We cited as an example "a 19th-century English case that concluded a plaintiff could bring an action seeking redress for libel against a publisher based upon an allegedly defamatory remark contained in a newspaper issued 17 years prior to the plaintiff's discovery of the defamation, on the theory that the sale to the plaintiff of the long-forgotten copy of the newspaper constituted a new publication, starting anew the running of the period of limitations. [Citation.]" (*Ibid.*) We observed "courts recognized that the advent of books and newspapers that were circulated among a mass readership threatened unending and potentially ruinous liability as well as overwhelming (and endless) litigation, as long as courts adhered to the rule that each sale of a copy of a newspaper or a book, regardless how long after original publication, constituted a new and separate publication." (*Ibid.*)

To correct these problems, "courts fashioned what became known as the single-publication rule, holding that, for any single edition of a newspaper or book, there was but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed. [Citations.]" (*Shively, supra,* 31 Cal.4th at p. 1245.) The common law single-publication rule was codified in 1955 when California adopted the Uniform Single Publication Act by enacting section 3425.3, which states, in part: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication . . . ." The prefatory note to the uniform act states that under the single-publication rule "any single integrated publication, such as one edition of a newspaper or magazine, or

one broadcast, is treated as a unit, giving rise to only one cause of action." (14 West's U. Laws Ann. (2005) U. Single Publication Act, p. 469.)[8]

The decision in *Gregoire v. G. P. Putnam's Sons* (1948) 298 N.Y. 119 [81 N.E.2d 45], upon which we relied in *Shively*, recognized that the purpose of the single-publication rule was to give meaning to the statute of limitations as "a statute of repose—designed 'to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.' [Citation.]" (*Id.*, 81 N.E.2d at p. 48.) The plaintiff in *Gregoire* filed a suit for defamation nearly five years after the book Total Espionage first was published. Although approximately 6,000 copies of the book had been sold in each of the first two years of its distribution, only 60 copies had been sold from stock in the year prior to the filing of the action. The plaintiff argued that these relatively few sales from stock caused the book to be "republished," triggering a new limitations period. The court observed that accepting the plaintiff's view would mean that "although a book containing libelous material may have been the product of but one edition or printing fifty years ago, if, by sale from stock or by display, the publisher continues to make unsold copies of the single publication available to the public today, such conduct would amount to a republication of any libel the book contains and thereby would become actionable. Under such a rule the Statute of Limitation would never expire so long as a copy of such book remained in stock and is made by the publisher the subject of a sale or inspection by the public." (*Id.* at pp. 48–49.)

The court in *Gregoire* thus held that the publisher was entitled to repose following the initial process of printing and releasing the book to the public and that subsequent sales from the stock so produced would not begin the statute of limitations anew. The court stated "that the publication of a libelous book, involving styling, printing, binding and those other acts which enable a publisher on a given date to release to the public thousands of copies of a single printing or impression, affords the one libeled a legal basis for only one cause of action which arises when the finished product is released by the publisher for sale in accord with trade practice." (*Gregoire v. G. P. Putnam's Sons, supra*, 81 N.E.2d at p. 49.)

The New York high court later described its holding in *Gregoire* as follows: "[T]he *Gregoire* court furnishes its own illustrations of the kind of

---

[8] The Uniform Single Publication Act has been adopted in six other states—Arizona (Ariz. Rev. Stat. § 12-651), Idaho (Idaho Code §§ 6-702 to 6-705), Illinois (740 Ill. Comp. Stat. 165/1-5), New Mexico (N.M. Stat. Ann. §§ 41-7-1 to 41-7-5), North Dakota (N.D. Cent. Code § 14-02-10), and Pennsylvania (42 Pa. Cons. Stat. § 8341)—and the "great majority" of the remaining states follow the single-publication rule by judicial decision. (*Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 777, fn. 8 [79 L.Ed.2d 790, 104 S.Ct. 1473].)

case in which the [single-publication] principle it articulated was to have its primary application. First, of course, was the case then at hand. It emanated from a publisher's sale from stock of a copy of the book containing the libelous language. Since this transaction occurred two years after the book had last undergone a printing and general distribution, the issue was whether the last printing or the later sale from stock was to be the point of departure for the running of the statute. Qualitatively . . . , the sale from stock here was one of only a trickle of 60 to which dwindling demand for the book had reduced such sales in the 12 months preceding initiation of suit. Thus, on its facts, *Gregoire* merely held that . . . the Statute of Limitations is not to be reactivated by a late sale from the residue of a time-barred publishing event." (*Rinaldi v. Viking Penguin, Inc.* (1981) 52 N.Y.2d 422 [438 N.Y.S.2d 496, 420 N.E.2d 377, 381].)

The first California case to apply the single-publication rule, *Belli v. Roberts Brothers Furs, supra,* 240 Cal.App.2d 284, held that the February 14, 1962, issue of the San Francisco Chronicle newspaper, which was composed of six editions that were issued over a two-day period was "a single, integrated publication." (*Id.* at p. 289.) The court concluded that "the Legislature intended to abrogate the right to bring a separate action based upon defamatory matter appearing in several editions of a newspaper or magazine, where, as here, all of the editions comprise a single issue of a particular date." (*Id.* at p. 289.)

█ The Court of Appeal therefore concluded that "[t]he various editions of the Chronicle for February 14, 1962, comprise a single integrated publication, namely the issue of the newspaper for that date. As we have seen, the allegedly defamatory matter appeared in the first edition and was repeated without change in each and every edition that followed. It has generally been held that, in the case of a single, integrated publication, the cause of action based upon objectionable matter appearing in the publication accrues upon the first general distribution of the publication to the public. [Citation.]" (*Belli v. Roberts Brothers Furs, supra,* 240 Cal.App.2d at p. 289; see *Fleury v. Harper & Row, Publishers, Inc.* (9th Cir. 1983) 698 F.2d 1022, 1027 ["In the case of a single, integrated publication, a cause of action accrues on the first general distribution of the publication to the public."]; *Rinaldi v. Viking Penguin, Inc., supra,* 420 N.E.2d 377, 381 ["the activities reasonably related to the production and distribution of a newspaper or magazine were regarded as part of a single transaction against which the statute would run from the time that the original circulation of the periodical, no matter how large or widespread, had taken place . . ."].)

█ The single-publication rule is intended to prevent a "single integrated publication" from resulting in numerous causes of action because the publication is received by a mass audience. (*Rinaldi v. Viking Penguin, Inc., supra,*

420 N.E.2d 377, 381 ["neither the time nor the circumstance in which a copy of a book or other publication finds its way to a particular consumer is, in and of itself, to militate against the operation of the unitary, integrated publication concept"].) As the Court of Appeal recognized in *Miller v. Collectors Universe, Inc.* (2008) 159 Cal.App.4th 988, 998 [72 Cal.Rptr.3d 194]: "The original purpose of the single-publication rule is apparent, both from its history and from the language of the California statute implementing it. The rule was originally directed at *mass* communications, such as communications in newspapers, books, magazines, radio and television broadcasts, and speeches to an audience. Where the offending language is read or heard by a large audience, the rule limits the plaintiff to a single cause of action for each mass communication. A separate cause of action for each member of the public audience is disallowed."

The rule does not address the issue of repeated publications of the same libelous material over a substantial period of time. (See *Kanarek v. Bugliosi* (1980) 108 Cal.App.3d 327, 332 [166 Cal.Rptr. 526] ["the Uniform Single Publication Act . . . was not designed to give unending immunity for repeated publications of libelous matter"].) This distinction is clearly made in the Restatement Second of Torts, which adopts the single-publication rule that "[a]ny one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." (Rest.2d Torts, § 577A, p. 208.) The comments explain: "An exceptional rule, sometimes called the 'single publication rule,' is applied in cases where the same communication is heard at the same time by two or more persons. In order to avoid multiplicity of actions and undue harassment of the defendant by repeated suits by new individuals, as well as excessive damages that might have been recovered in numerous separate suits, the communication to the entire group is treated as one publication, giving rise to only one cause of action." (*Id.*, com. b, p. 209.) "The single publication rule applies also to the issue of any one edition of a newspaper, magazine or book; to any one broadcast over radio or television; to any one exhibition of a motion picture; to any one theatrical performance or other presentation to an audience; and to any similar aggregate communication that reaches a large number of persons at the same time. . . ." (*Id.*, com. c, p. 209.)

It is not clear whether the production of a product label over a period of years is a "single integrated publication" that triggers the running of the statute of limitations when the first such label is distributed to the public. Publishing an issue of a newspaper or magazine or an edition of a book is a discrete publishing event. A publisher that prints and distributes an issue of a magazine or an edition of a book is entitled to repose from the threat that a copy of that magazine or book will surface years later and trigger a lawsuit. But as we stated earlier, there is little case law or academic commentary discussing whether a manufacturer that produces a product label for a period

of years is entitled to the same repose, especially while that product label is still being produced. Christoff argues that Nestlé's conduct qualified as a continuing wrong, in which "a cause of action accrues each time a wrongful act occurs, triggering a new limitations period." (*Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal.App.4th 1288, 1295 [2 Cal.Rptr.3d 497].) Nestlé, by contrast, argues that its use of Christoff's image on its product label was a "single overt act" with "a continual effect that is relevant to damages, but does not denote a continuing course of conduct for which the limitations period can be tolled." (*Blair v. Nevada Landing Partnership* (2006) 369 Ill.App.3d 318 [307 Ill.Dec. 511, 859 N.E.2d 1188, 1193]; accord, *Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater* (S.D.N.Y. 2001) 150 F.Supp.2d 566.)

■ We decline to resolve this important issue without the benefit of a sufficient factual record that reveals the manner in which the labels were produced and distributed, including when production of the labels began and ceased. (*Lahr v. Adell Chemical Co.* (1st Cir. 1962) 300 F.2d 256, 260 ["Whether the single publication rule should be applied to the circumstances of this case had best be decided when we know what they were."].) The parties did not have a reason or an opportunity to present such evidence in light of the trial court's erroneous ruling that the single-publication rule did not apply to claims for misappropriation of likeness. The parties will have that opportunity on remand to the superior court. If on remand it is established that all or some portion of the production of the label constituted a single integrated publication, then the superior court should further consider whether the statute of limitations began anew because the label was "republished" within the meaning of the single-publication rule.

Whether producing the product labels was a "single integrated publication" is not the only issue that the trial court will face on remand. Evidence was introduced at trial that Christoff's image also was used without his consent in various forms of advertising, including transit ads, coupons in newspapers, magazine advertisements, and Internet advertisements. Nestlé may be able to show that the production of some or all of these items were single integrated publications and that the statute of limitations was triggered as to that item when it first was distributed to the public.

■ The Court of Appeal further held that the trial court erred in instructing the jury to apply the delayed discovery rule if it found that "prior to his discovery of the facts [Christoff] did not previously suspect, or should have suspected, that his photograph was on the Taster's Choice label." We agree. "[C]ourts uniformly have *rejected* the application of the discovery rule to libels published in books, magazines, and newspapers, pointing out that application of the discovery rule would undermine the protection provided by

the single-publication rule." (*Shively, supra*, 31 Cal.4th at p. 1250.) The same logic applies to a product label such as the one in the present case that is "not published in an inherently secretive manner" (*Hebrew Academy of San Francisco v. Goldman, supra*, 42 Cal.4th 883, 894), but is distributed widely to the public.

## DISPOSITION

The judgment of the Court of Appeal is reversed to the extent that it holds that, for purposes of the statute of limitations, Christoff's cause of action necessarily accrued when Nestlé first "published" the label under the rule we announced in *Shively v. Bozanich, supra*, 31 Cal.4th 1230. In all other respects, the judgment of the Court of Appeal is affirmed and the matter is remanded to the Court of Appeal for further proceedings consistent with our opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur fully in the majority opinion. In particular, I agree that without a better factual record we cannot determine how California's single publication rule (Civ. Code, § 3425.3 (hereafter section 3425.3)) should apply here and hence whether, or to what extent, plaintiff's action is barred by the statute of limitations. Nonetheless, I believe some general principles relevant to that question may be discerned from the language of section 3425.3.[1]

Leaving aside any Taster's Choice labels on which plaintiff's image was significantly altered, and further disregarding advertisements that employed photographs of a label,[2] the broadest question posed here is whether *all* distribution of labels employing the original misappropriated image, whenever they occurred, should be deemed to constitute a single publication for purposes of section 3425.3. Phrased more generally, should a series of temporally distinct publications be treated as a single publication because each consisted of substantially the same text or images?

---

[1] Section 3425.3 states: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."

[2] That both these categories constituted separate publications from the original labels themselves seems clear, as they differed in content from the original labels and were apparently aimed at different audiences. (See *Rinaldi v. Viking Penguin, Inc.* (N.Y.Sup.Ct. 1979) 101 Misc.2d 928 [422 N.Y.S.2d 552, 556]; *Kanarek v. Bugliosi* (1980) 108 Cal.App.3d 327, 332–333 [166 Cal.Rptr. 526].)

On this question, California courts have not spoken,[3] and courts from other jurisdictions have reached diverse results. Some have held that multiple broadcasts, distributions or displays of identical material constitute a single publication for purposes of the statute of limitations, and not a series of republications. (See, e.g., *Blair v. Nevada Landing Partnership* (2006) 369 Ill.App.3d 318 [307 Ill.Dec. 511, 859 N.E.2d 1188, 1193–1194] [use of the plaintiff's image in various advertisements within a casino and on the casino's Web site over a nine-year period treated as a single publication]; *Auscape Intern. v. National Geographic Soc., supra,* 461 F.Supp.2d at pp. 185–187 [the defendant, which each year distributed a digital compilation of past magazine issues, including in each year's compilation all the prior years' contents, did not thereby republish the prior years' issues]; *Zoll v. Jordache Enterprises Inc.* (S.D.N.Y. 2002) 2002 WL 31873461, pp. *9–*11 [rebroadcast of 1978 television commercial in 2000 was not a republication of the original 1978 broadcast].)

Other courts have looked on each broadcast or display as a separate publication, or republication, each of which, if it violates the plaintiff's rights, begins a new limitations period. (See, e.g., *Wells v. Talk Radio Network-FM, Inc.* (N.D.Ill. 2008) 2008 WL 4888992, pp. *1–*3 [each unauthorized use of the plaintiff's voice in radio advertisements broadcast repeatedly for two years was a rebroadcast triggering a new statute of limitations period]; *Lehman v. Discovery Communications, Inc.* (E.D.N.Y. 2004) 332 F.Supp.2d 534, 535–536 [where the defendant broadcast a program 17 times over more than two years, each broadcast was a republication of the allegedly defamatory material]; *Baucom v. Haverty* (Fla.Dist.Ct.App. 2001) 805 So.2d 959, 960–961 [where, over several years, the defendant repeatedly used the plaintiff's name and image in marketing presentations to potential clients, each such presentation was a new publication].)

In my view, the latter approach is more consistent with our statutory language. As illustrative of a single publication, section 3425.3 refers to "any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." The statute thus dictates we treat as a separate publication any reissue, rebroadcast or reexhibition, even though the publication's contents or the manner of its distribution or display has not been changed. Section 3425.3's reference to "any one broadcast," for example, appears to preclude a result like that in *Zoll v. Jordache Enterprises, Inc.,*

---

[3] The district court in *Auscape Intern. v. National Geographic Soc.* (S.D.N.Y. 2006) 461 F.Supp.2d 174, cited in the text, *post,* however, did attempt to apply California law in deciding one version of the question.

*supra,* 2002 WL 31873461, where two broadcasts of the same advertisement, separated by 22 years, were deemed to be a single publication.[4]

Granted, determining what is a single "issue" of printed material presents special difficulties. When large numbers of a book are printed and distributed at one time, the later distribution of smaller numbers from stock is considered part of the original publication. (*Gregoire v. G. P. Putnam's Sons* (1948) 298 N.Y. 119 [81 N.E.2d 45, 46, 49].) The same rule has been applied to additional printings of a single book edition, at least within a short time of its original publication. (See *Fleury v. Harper & Row, Publishers, Inc.* (9th Cir. 1983) 698 F.2d 1022, 1028 [where a book was published in November 1978, "continued printing of the book into 1979" was part of the same publication].) Would the same rule apply if there were no initial mass printing, but individual copies or small batches of copies were printed and sent out to readers on demand? Arguably it should, for each instance of access to text on the Internet is not considered a separate publication (*Firth v. State* (N.Y.Ct.Cl. 2000) 184 Misc.2d 105 [706 N.Y.S.2d 835, 841–843]), nor presumably would be each download of text in digital form to an electronic reader or audio device; the use of printed paper as a distribution medium should not lead to a different result.

A useful distinction lies in earlier cases' criterion of a republication decision that is " ' "conscious [and] independent" ' " (*Barres v. Holt, Rinehart & Winston, Inc.* (1974) 131 N.J. Super. 371 [330 A.2d 38, 46], italics omitted, affd. (1977) 74 N.J. 461 [378 A.2d 1148]) or "conscious and deliberate" (*Rinaldi v. Viking Penguin, Inc.* (1981) 52 N.Y.2d 422 [438 N.Y.S.2d 496, 420 N.E.2d 377, 382]). Where the publisher has set up a more or less automated system for printing and distributing an item or for downloading it in digital form and does not make a separate publishing decision as to each copy or small batch of copies, to call each such distribution a new "issue" of the material would defeat the purposes of the single publication rule. (See *Firth v. State, supra,* 706 N.Y.S.2d at p. 843.) Conversely, where a publication has been out of print or unavailable in digital form for some time and the publisher makes a conscious decision to reissue it or again make it available for download, no reason appears in the text or purposes of section 3425.3 why the publisher should not be separately responsible for any tort committed in republishing.

---

[4] Indeed, the court in *Zoll v. Jordache Enterprises, Inc.,* acknowledged that its approach, which it considered settled under New York law, diverged from that of the Restatement Second of Torts, under which subsequent broadcasts of the same material were deemed republications. (*Zoll v. Jordache Enterprises, Inc., supra,* 2002 WL 31873461 at p. *10.) Section 3425.3 clearly adopts the Restatement's view on this point by making "any one broadcast" a separate publication.

For these reasons, I doubt defendant's entire five-year course of printing and distributing labels may be deemed a single publication simply because the labels were not substantially altered during that time. The trial court should consider as well whether the production and distribution of labels was predetermined by a single initial decision or whether defendant (that is, the officers or managing agents of defendant corporation) made at any relevant time a conscious, deliberate choice to continue, renew or expand the use of labels bearing plaintiff's misappropriated image. If any such decisions occurred during the period defined by the statute of limitations, plaintiff should be able to recover damages caused by publication pursuant to those decisions.

Respondent's petition for a rehearing was denied September 17, 2009.