NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-936                                            Appeals Court

          ROBERT WOLSFELT  vs.  GLOUCESTER TIMES.


                        No. 19-P-936.

        Essex.     May 8, 2020. - September 1, 2020.

        Present:  Singh, Wendlandt, & McDonough, JJ.[1]


Libel and Slander.  Newspaper.  Internet.  Limitations, Statute
     of.  Practice, Civil, Summary judgment, Statute of
     limitations.



     Civil action commenced in the Superior Court Department on
June 12, 2015.

     The case was heard by Shannon Frison, J., on a motion for
summary judgment.


     Steven C. Goldwyn for the plaintiff.
     Jonathan M. Albano for the defendant.


     WENDLANDT, J.  In libel cases, the general rule is that the

cause of action accrues, and the statute of limitations begins

to run, on the date of the publication of the alleged defamatory

_____

     [1] Justice McDonough participated in the deliberation on this
case while an Associate Justice of this court, prior to his
reappointment as an Associate Justice of the Superior Court.

statement.  See <u>Flynn</u> v. <u>Associated Press</u>, 401 Mass. 776, 780 (1988).  In this appeal, we apply the statute of limitations to a defamatory statement posted on a newspaper's website.  We hold that such Internet postings are subject to the single publication rule, which governs other types of aggregate communications.  Under the rule, a person may bring one (and only one) cause of action for defamation against the publisher based on its publication of the defamatory statement.  The statute of limitations for the action begins to accrue when the statement first is posted on the website.  We also hold that where (as here) the website is widely and publicly available and not maintained confidential, the discovery rule does not apply.  Applying these principles to the defamatory articles in this case, we conclude that the plaintiff's claim is time barred as to the first publication.  With regard to the second publication, the alleged defamatory statements about the plaintiff's arrest are governed by the fair report privilege.  Accordingly, we affirm the allowance of summary judgment in favor of the defendant.

<u>Background</u>.  The plaintiff, Robert Wolsfelt, brought claims against the defendant, Gloucester Times, for its defamatory articles.  The articles concern two separate incidents of domestic violence, each of which resulted in Wolsfelt's arrest.

Article one.  The first incident occurred on November 30, 2011.[2]  The Gloucester Police Department received a 911 call from Wolsfelt who claimed he was injured after his fiancée pushed him down the stairs.  En route to the scene, the officers were notified that the fiancée had also called the police, stating that she had locked herself in the bathroom in fear of Wolsfelt.  After the officers arrived, the fiancée told the officers that Wolsfelt called her earlier from a bar where he had been drinking; she told him not to return home.  Nonetheless, Wolsfelt (in an intoxicated state) returned home.  He rummaged through her pocketbook, and when she told him to stop, he grabbed her by the throat.  Officers noticed that she had red marks on her neck.  She pushed him, causing him to fall down the stairs.[3]

Wolsfelt was transported to a hospital where he relayed a different version of the events.  He stated that while retrieving his computer, his fiancée pushed him down the stairs.  In response to questions regarding the red marks on his fiancée's neck, Wolsfelt posited that the marks may have been left when the fiancée was wrestling with her children.  After Wolsfelt was released from the hospital, he was arrested and

---

[2] We recite the facts as set forth in the police reports for each arrest.

[3] The fiancée did not seek a restraining order.

charged with domestic assault and battery. On the same day, Gloucester Times published an article online regarding this incident (article one). Article one, entitled "Gloucester Police/Fire: City man charged in domestic assault," largely tracked the police report.

On February 17, 2012, a "general continuance" with a "no abuse" order was entered in Wolsfelt's criminal case.[4] Gloucester Times updated article one on its website, stating "[t]he charge of assault and battery brought against Robert Wolsfeld [sic] was continued without a finding on Feb. 17, 2012" (article one update). The article one update appeared above the original article one, which was set forth in full on the same page.

Article two. The second incident occurred less than one year later, during the late hours of June 7, 2012. The Gloucester Police Department received a 911 call from the fiancée, alleging that Wolsfelt was attempting to harm her, and that knives were present in the area. En route to the scene, the officers received a call from Wolsfelt and directed him to remain outside. When the officers arrived at the scene, Wolsfelt was sitting outside of the residence, apparently intoxicated. He stated that he had an argument with his

_____

[4] The charge was dismissed on May 18, 2012.

fiancée, and when she called the police, he tried to take the telephone from her. Wolsfelt admitted that, during the ensuing fight, he pushed her. His fiancée was also interviewed by the officers; she reiterated Wolsfelt's account, providing a few more details. Wolsfelt was arrested and charged with, inter alia, domestic assault and battery. On June 8, 2012, Gloucester Times published an article online regarding this incident (article two). Article two, entitled "Gloucester Police/Fire: Lanesville man charged in domestic assault," largely tracked the police report.

On February 19, 2013, Wolsfelt admitted to sufficient facts, and a continuance without a finding (CWOF) was entered.[5] Gloucester Times posted an update to article two, stating "[t]he charge of assault and battery brought against Robert Wolsfeld [sic] was continued without a finding for 18 months on Feb. 19, 2013" (article two update). The article two update appeared at the top of the webpage, just above article two, which was set forth in full.

Wolsfelt's discovery of the articles. Wolsfelt did not learn about the articles until February 2013, when he applied for a job. On June 12, 2015, Wolsfelt brought an action against Gloucester Times for defamation and injunctive relief seeking

---

[5] The charge was dismissed on August 19, 2014.

removal of the two articles, along with their respective updates. He asserted that the articles contained "untrue, incomplete, misleading[,] and damaging assertions," resulting in harm that included loss of reputation and potential employment. The filing date of the complaint was more than three years after article one, the article one update, and article two first were posted online; however, it was less than three years after the publication of the article two update. Gloucester Times moved for summary judgment, which a Superior Court judge allowed on the basis that Wolsfelt's claims were time-barred and, in any event, the articles were protected under the fair report privilege.

Discussion. "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Summary judgment "make[s] possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved" (citation omitted). Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991). Where the nonmovant bears the burden of proof at

trial, the moving party "is entitled to summary judgment if [it] demonstrates . . . that [the nonmovant] has no reasonable expectation of proving an essential element of [his] case" (citation omitted).  Butcher v. University of Mass., 483 Mass. 742, 747 (2019), cert. denied sub nom. Butcher v. Vishniac, S. Ct.  (2020).  Our review is de novo.  See LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 318 (2012).

1.  Statute of limitations.  We turn first to the question whether Wolsfelt's complaint for defamation was filed within the statute of limitations.  An action for defamation must be commenced within three years after the cause of action accrues. G. L. c. 260, § 4.  "In defamation cases, 'the general rule is that the cause of action accrues, and the statute of limitations begins to run, on publication of the defamatory statement.'  A statement is published when it is communicated to a third party."  Harrington v. Costello, 467 Mass. 720, 725 (2014), quoting Flynn, 401 Mass. at 780.  Where a defendant raises the statute of limitations as an affirmative defense, the plaintiff bears the burden of proving the action was timely commenced.  Parr v. Rosenthal, 475 Mass. 368, 376 (2016).

a.  Article one and update.  With regard to article one and the article one update, Wolsfelt filed his complaint more than three years after publication of the alleged defamatory statements on the defendant's website.  Accordingly, Wolsfelt

"has the burden of establishing facts that take him outside the statutory three-year limitations period." Harrington, 467 Mass. at 725.

  i.  Single publication rule.  Wolsfelt first appears to argue that each time a third party accessed the website on which article one and its update were posted, a new communication occurs, and thus the statute of limitations has not run so long as article one and its update "remain[] on the Internet." Concluding that the single publication rule applies, we disagree.

  Under the common law, each separate communication of a defamatory statement to a third party gave rise to a new cause of action.  See Restatement (Second) of Torts § 577A(1) (1977). The single publication rule addresses the treatment of an aggregate communication of a defamatory statement as occurs when, for example, a statement is made to a crowd, broadcast by television or radio, or printed in a newspaper or book.  Under the rule, the publication of a defamatory statement in this aggregate manner is, in legal effect, one publication, although such publication is received by multiple third parties at the same time or consists of many copies widely distributed. See Bigelow v. Sprague, 140 Mass. 425, 427-428 (1886) ("all the several deliveries [of the defamatory pamphlet] made by [the defendant] were to be treated as substantiating the allegation

of a [single] publication. . . . [F]or, if each delivery of a copy is to be dealt with only[,] and for all purposes[,] as a separate publication, courts could not distinguish between publication in a newspaper and in a private letter. A closer analogy . . . would seem to be that of an oral slander addressed to a crowd").[6]

Rather than each copy giving rise to a separate cause of action, the single publication rule treats the aggregate communication as one publication that gives rise to one and only one cause of action. See Restatement (Second) of Torts § 577A(4). The statute of limitations for the single action runs from the point at which the original dissemination occurred. See Flynn, 401 Mass. at 780 (in libel cases, statute of limitations begins to run on date of publication).[7]

The single publication rule is founded on two considerations. First, "[t]he rule is justified by the necessity of protecting defendants and the courts from the numerous suits that might be brought for the same words if each person reached by such a large-scale communication could serve

---

[6] See also Restatement (Second) of Torts § 577A(3), at 208 ("Any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication").

[7] See also Firth v. State, 98 N.Y.2d 365, 369 (2002) (under single publication rule, statute of limitations runs from date of first publication).

as the foundation for a new action."  Restatement (Second) of Torts § 577A comment c, at 209.[8]  A contrary rule -- one that would permit a new cause of action for each third party who receives the communication to restart the limitations period -- would thwart the repose intended by the Legislature in establishing a statute of limitations in the first place. See Firth v. State, 98 N.Y.2d 365, 369 (2002).

Second, the single publication rule inures to the benefit of the allegedly defamed party, who may recover all damages stemming from the multiple copies of the publication in the one action.  See Bigelow, 140 Mass. at 427 ("when a libel is printed in an edition of many copies for general circulation, the extent of the circulation procured or caused by the publisher may be shown against him as evidence of the injury to the person libeled").  See also Firth, 98 N.Y.2d at 370 ("the single publication rule actually reduces the possibility of hardship to plaintiffs by allowing the collection of all damages in one case commenced in a single jurisdiction").

These considerations counsel in favor of applying the single publication rule to Internet publications.  The Internet

---

[8] See Christoff v. Nestlé USA, Inc., 47 Cal. 4th 468, 478 (2009) (common-law multiple publications rule "had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book" [citation omitted]).

(when coupled with a robust search engine) comprises a platform for instantaneous, worldwide communications to a multitude of readers across geographies, often for an indefinite period of time.  See Firth, 98 N.Y.2d at 370, citing Reno v. American Civ. Liberties Union, 521 U.S. 844, 853 (1997) (policies impelling original adoption of single publication rule "are even more cogent when considered in connection with the exponential growth of the instantaneous, worldwide ability to communicate through the Internet").  Permitting a separate cause of action for each "hit" or viewing of defamatory statement by a third party on the Internet "would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants.  Inevitably, there would be a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise."  Firth, supra.  See Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 615 (7th Cir. 2013) ("excluding the Internet from the single-publication rule would eviscerate the statute of limitations and expose online publishers to potentially limitless liability").  At the same time, the single publication rule permits a plaintiff to recover, in one suit, all damages stemming from the allegedly defamatory statement instead of filing separate suits each time

a third party accesses the webpage containing the defamatory content.  See Bigelow, 140 Mass. at 427; Firth, supra.

For these reasons, "[e]very state court that has considered the question applies the single-publication rule to information online." Pippen, 734 F.3d at 615, citing Christoff v. Nestlé USA, Inc., 47 Cal. 4th 468 (2009); Churchill v. State, 378 N.J. Super. 471 (App. Div. 2005); Woodhull v. Meinel, 145 N.M. 533 (App. 2008); Firth, 98 N.Y.2d 365; T.S. v. Plain Dealer, 194 Ohio App. 3d 30 (2011); Kaufman v. Islamic Soc'y of Arlington, 291 S.W.3d 130 (Tex. App. 2009); Ladd v. Uecker, 323 Wis. 2d 798 (App. 2010).[9]  Additionally, Federal courts considering the question have concluded that the relevant State supreme court would agree.[10]  Accordingly, we now join those jurisdictions and

---

[9] See Simon v. Arizona Bd. of Regents, 28 Media L. Rep. (BNA) 1240 (Ariz. Super. Ct. 1999); Traditional Cat Ass'n v. Gilbreath, 118 Cal. App. 4th 392 (2004); McCandliss v. Cox Enters., Inc., 265 Ga. App. 377 (2004), overruled on other grounds by Infinite Energy, Inc. v. Pardue, 310 Ga. App. 355, 363 (2011).

[10] See Pippen, 734 F.3d at 615, citing Shepard v. TheHuffingtonPost.com, Inc., 509 Fed. Appx. 556 (8th Cir. 2013) (Minnesota law); In re Philadelphia Newspapers, LLC, 690 F.3d 161, 174–175 (3d Cir. 2012) (Pennsylvania law).  See also Kiebala v. Boris, 928 F.3d 680, 686 (7th Cir. 2019) (Illinois law); Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137, 146 (5th Cir. 2007) (Texas law); Jankovic v. International Crisis Group, 494 F.3d 1080, 1087 (D.C. Cir. 2007) (District of Columbia law); Van Buskirk v. New York Times Co., 325 F.3d 87, 89-90 (2d Cir. 2003) (New York law); Lane v. Strang Communications Co., 297 F.Supp. 2d 897 (N.D. Miss. 2003) (Mississippi law); Mitan v. Davis, 243 F.Supp. 2d 719 (W.D. Ky. 2003) (Kentucky law).

extend the single publication rule to articles posted to an online media's publicly available website.[11]

ii.  Discovery rule.  Wolsfelt next argues that the discovery rule tolled the statute of limitations for article one and its update because he did not learn about the publications until February 2013, when he applied for a job.  The discovery rule tolls the statute of limitations period for certain causes of action such that the action does not "accrue" (and hence the limitations does not start) until "the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct" (citation omitted).  Flynn, 401 Mass. at 781 (collecting cases).  The rule "applies only to 'inherently unknowable' causes of action."  Id., quoting White v. Peabody Constr. Co., 386 Mass. 121, 130 (1982).  By contrast, where an alleged defamatory publication is broadly circulated to the public, and did not involve concealment or confidential communications, the discovery rule does not apply.

---

[11] Wolsfelt cites to no authority declining to extend the single publication rule to Internet publications; and the only case we have located declining to apply the single publication rule to an Internet publication addressed a set of confidential electronic communications with limited accessibility that was different in kind from the type of mass communication presented here.  See Swafford v. Memphis Individual Practice Ass'n, Tenn. Ct. App., No. 02A01-9612-CV-00311 (June 2, 1998) (where defamatory statements from electronic database were confidentially maintained and communicated only in response to member request, single publication rule did not apply).

See <u>Harrington</u>, 467 Mass. at 727 n.10; <u>Flynn</u>, <u>supra</u> at 781-782 & n.7.  Thus, in <u>Flynn</u>, <u>supra</u> at 781, the court held that the discovery rule does not toll the statute of limitations for defamatory statements in a printed newspaper widely available to the public.  See <u>Fleury</u> v. <u>Harper & Row, Publs., Inc</u>., 698 F.2d 1022, 1028 n.4 (9th Cir. 1983) (discovery rule inapplicable to book publication announced in nationally distributed magazine widely available to public as it was not confidential document nor concealed).

The same reasoning precludes application of the discovery rule in the present case.  In particular, the record does not establish that Wolsfelt's cause of action was inherently unknowable on November 30, 2011, when article one published or on February 17, 2012, when the update published.  Wolsfelt does not allege that the article or the update were concealed or confidential.  To the contrary, Wolsfelt admits that the article and the update were publicly available on the Gloucester Times' website and that a search engine query with his name produces the article and update as a result.  Accordingly, Wolsfelt's claims for defamation regarding article one and its update, brought on June 12, 2015, are time barred.

b.  <u>Article two and update</u>.  Wolsfelt argues that article two, which was published on June 8, 2012, and was updated on February 19, 2013, stands on different footing in light of the

republication exception to the single publication rule. Specifically, the single publication rule applies only to the first release of a defamatory statement; under the republication exception, "[a]ny future republication of the [alleged] false statements . . . could form the basis for a new cause of action against the republisher." Flynn, 401 Mass. at 780 n.5. Thus, republishing material, editing and reissuing material, or placing it in a new form that includes the defamatory material, can create a new cause of action, which begins to run on the date of republication. See Restatement (Second) of Torts § 577A comment d, at 210 ("the single publication rule . . . does not include separate aggregate publications on different occasions"). Wolsfelt contends that the article two update acted as a republication of article two. We need not decide whether the placement of the article two update on the same webpage and just above the text of article two republished article two because, even assuming arguendo that it did, the statements in article two fall within the fair report privilege.[12]

---

[12] As courts in other jurisdictions have noted, the application of the republication exception is complicated with regard to Internet publications because many websites "are in a constant state of change, with information posted sequentially on a frequent basis." Firth, 98 N.Y.2d at 371. Application of the republication exception to any change of a website would, in the context of the Internet, foil the single publication rule, "discourag[ing] the placement of information on the Internet or

2.  Fair report privilege.  "The fair report privilege establishes a safe harbor for those who report on statements and actions so long as the statements or actions are official and so long as the report about them is fair and accurate."  Howell v. Enterprise Publ. Co., 455 Mass. 641, 651 (2010).

---

slow[ing] the exchange of such information, reducing the Internet's unique advantages [and] . . . forc[ing a publisher] either to avoid posting on a Web site or [to] use a separate site for each new piece of information."  Id. at 372.  These courts have held that minor or nonsubstantive changes to an Internet posting do not fall within the republication exception, but substantive changes may.  Compare Kiebala v. Boris, 928 F.3d 680, 686-688 (7th Cir. 2019) (republication doctrine did not apply where defendant did not change substance of original post but only updated date on website); In re Philadelphia Newspapers, LLC, 690 F.3d 161, 175 (3d Cir. 2012) (neither hyperlink nor reference to defamatory material fell within republication exception); Jankovic v. International Crisis Group, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (online posting of previously printed report without updating content did not fall within republication exception); Canatella v. Van De Kamp, 486 F.3d 1128, 1135-1136 (9th Cir. 2007) (no republication where defendant publishers changed Internet address of original post containing defamatory statement but content remained unchanged); Salyer v. Southern Poverty Law Ctr., Inc., 701 F.Supp. 2d 912, 916-917 (W.D. Ky. 2009) (website articles that referenced original defamatory article did not fall within republication exception because they merely called existence of article to attention of new audience and did not present defamatory content of article to audience); Firth, 98 N.Y.2d at 371 ("mere addition of unrelated information to a Web site [that had a defamatory statement as to which the statute of limitations has run] cannot be equated with the repetition of defamatory matter in a separately published edition of a book or newspaper . . . for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience"), with Yeager v. Bowlin, 693 F.3d 1076, 1082 (9th Cir. 2012) (adding substantive information regarding plaintiffs to website may create new cause of action under republication exception).

See Butcher, 483 Mass. at 750. (discussing history of fair report privilege). Where, as here, police undertake an official response to a complaint, such as an arrest, both that response and the allegations that gave rise to it fall within the privilege. See Jones v. Taibbi, 400 Mass. 786, 795 (1987) ("The publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true" [citation omitted]). Wolsfelt does not contest that he was arrested as reported by article two. Nonetheless, he asserts that the omission of certain details strips the article of the protections afforded by the fair report privilege.

"[A] report need give only a rough-and-ready summary that was substantially correct in order to qualify for the fair report privilege. A statement is considered a fair report if its gist or sting is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced" (quotations and citation omitted). ELM Med. Lab., Inc. v. RKO Gen., Inc., 403 Mass. 779, 783 (1989). Article two tracks almost precisely the police report of Wolsfelt's arrest.[13] Wolsfelt complains only that it left out the detail that his lip was bleeding, that the fiancée later accused him not only of shoving her but also of choking her, and

---

[13] Wolsfelt does not claim the article two update was defamatory.

that Gloucester Times did not interview him to obtain "his side" for the publication.  None of these affect the application of the privilege; the gist and sting of article two is the same without these details.  Wolsfelt, who was intoxicated at the time, was arrested for assault and battery after his fiancée, whom he admitted shoving, called the police.  Nothing more was required to provide the "rough-and-ready summary" that is protected by the fair report privilege.[14]  Id.

Judgment affirmed.

---

[14] Wolsfelt also contends that statements in article two concerning separate incidents unrelated to Wolsfelt were "prejudicial inaccuracies" and harmful because the article did not indicate expressly that there were separate crimes, unrelated to Wolsfelt.  No reasonable reading of article two fairly suggests that these distinct incidents, which are expressly described as involving different occurrences at different residences, concerned Wolsfelt.  See New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 395 Mass. 471, 480 (1985).