Filed 6/17/21  Hansen v. The Coca-Cola Co. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| JEANNE E. HANSEN, as Co-trustee, etc. et al., | D077588 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2016-00021046-CU-MC-CTL) |
| THE COCA-COLA COMPANY et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Reversed; remanded with directions.

Shook Hardy & Bacon, M. Kevin Underhill, Marc P. Miles and Frank C. Rothrock, for Defendants and Appellants.

Higgs Fletcher & Mack, John Morris and Rachel Moffitt Garrard; The Hamideh Firm and Bassil A. Hamideh, for Plaintiffs and Respondents.

This case concerns who has the right to use Hubert Hansen's publicity. In 1935, Hubert[1] founded a fresh juice company in Los Angeles that bore his last name. After his death in 1951, his children and grandchildren continued to operate and expand Hubert's business. Some forty years later, in a series of transactions, Monster Energy Company (Monster Energy) ultimately purchased the two businesses that were run by Hubert's descendants. After doing so, Monster Energy used Hubert's name and story to market some of its juice, lemonade, and soda products.

In 2015, Monster Beverage Company[2] sold certain brands to the Coca-Cola Company (Coke). Among the brands sold was the Hansen brand Monster had acquired from Hubert's descendants. After the Monster/Coke deal was announced but before it was completed, Hubert's descendants created the Hubert Hansen Intellectual Property Trust (Trust). Various descendants of Hubert who claimed an interest in the right of publicity from Hubert sold or assigned that interest to the Trust.[3]

The Trust then demanded that Monster Beverage pay it for Monster's use of Hubert's publicity. Monster Beverage refused and filed a registration

---

[1] Because of the number of Hansens involved in this matter, both as last names for many individuals and names for various companies, we refer to Hubert Hansen as Hubert to avoid any confusion. In addition, we generally will refer to other individual Hansens by their first names as well.

[2] Monster Energy is a wholly owned subsidiary of Monster Beverage Company (Monster Beverage).

[3] Guadalupe Hansen Krikorian, who claimed to have an interest in Hubert's publicity, did not transfer her interest to the Trust.

of claim under Civil Code[4] section 3344.1 with the California Secretary of State. The Trust then registered a claim with the California Secretary of State as well.

After Monster Beverage would not pay the Trust, the Trust, as well as Jeanne E. Hansen, Timothy M. Hansen, and Maureen T. Todd, in their capacities as co-trustees of the Trust (the Trust and co-trustees are collectively Respondents), sued Coke and Monster Beverage for misappropriation of Hubert's right of publicity and declaratory relief.[5] In defense of the suit, one of Appellants' arguments was that Monster Energy acquired the right to use Hubert's publicity through two asset transfer agreements that included all intellectual and intangible property owned and used by companies operated by Hubert's descendants. These asset transfers were memorialized in written documents.

The dispute proceeded to a bifurcated trial wherein the first phase was tried to the superior court and the second phase to a jury.

After the first phase, the trial court found that the Trust owned 90 percent of Hubert's right of publicity.[6] In making this finding, the court determined that the Trust's successor in interest registration filed

---

[4] Statutory references are to the Civil Code unless otherwise specified.

[5] In the second amended complaint, Respondents, in addition to Coke and Monster Beverage, named Monster Energy and Nexstep Beverage, LLC (Nexstep) as Doe Defendants 1 and 2 respectively. Nexstep is a wholly owned subsidiary of Coke. Coke, Monster Beverage, Monster Energy, and Nexstep are parties to this appeal and will collectively be referred to as Appellants.

[6] The trial court also found that Krikorian owned 10 percent of Hubert's right of publicity. Krikorian was not a party in the trial below and is not a party to this appeal. The court found that Appellants did not own any interest in Hubert's right of publicity.

3

June 5, 2015 was valid, and Monster's successor in interest registration filed April 8, 2015 was void. The court also interpreted two written asset transfers detailing the purchase of businesses owned by Hubert's descendants. In doing so, the court considered extrinsic evidence and found that the right to use Hubert's publicity was not included in either of the two deals.

The remaining issues were tried before a jury, which found in favor of Respondents and awarded them damages in the amount of $9,596,450.98.

Appellants appeal, claiming (1) the trial court abused its discretion by bifurcating the trial; (2) the trial court committed multiple errors in the bifurcated phase of the trial, including resolving conflicts in the extrinsic evidence to interpret the agreements that Appellants contend transferred the right to use Hubert's right of publicity to them; (3) the trial court improperly instructed the jury; (4) substantial evidence did not support the jury's finding that Hubert was a "deceased personality" under section 3344.1; (5) the judgment violated Respondents' right to create transformative works from intellectual property they owned; (6) a new trial is warranted because of juror misconduct; and (7) substantial evidence does not support the damage award.

We agree with Appellants that the trial court erred in resolving conflicts in extrinsic evidence to interpret the two asset transfer agreements, including making credibility determinations. Such determinations are the province of the jury. In addition, in the event the parties retry this matter after remand, we address Appellants' claim that the court erroneously instructed the jury and conclude that we cannot determine whether the subject jury instruction was legally erroneous on the record before us. We do not reach the remaining issues raised by Appellants.

4

FACTUAL AND PROCEDURAL BACKGROUND

Hubert founded the Hansen Fresh Fruit and Vegetable Juice Company in 1935. He began by making small batches of fresh juice and selling it door to door. As the business expanded, Hansen also set up juice stands near Hollywood studio locations, and his customers included studio workers and actors. He also sold his juices at outdoor vegetable markets.

Hubert was an innovator in the juice industry, making his juices all natural and organic. He started a trade organization and was elected its first president; he received a national award by the Public Health Association of America; and he received an entrepreneur award from a fruit and vegetable food magazine. He was "a legend" in Southern California, known in the industry as the "Juice King."

Hubert died in 1951. He was survived by his wife, Florence, and their five children. In 1970, the company incorporated and changed its name to Hansen's Juices, Incorporated (Hansen's Juices). Hansen's Juices continued Hubert's goal to market fresh fruit and vegetable juices. Allegedly with permission from family members in addition to those operating the company, Hansen's Juices used Hubert's name and story in marketing its products.[7]

In 1977, Tim Hansen, Hubert's grandson, left his job at Hansen's Juices and founded a new company, Hansen Foods, Incorporated (Hansen Foods). Tim wanted to expand into production of beverages with a longer shelf life. Tim negotiated for permission to use the Hansen's trademark. Hansen Foods also developed a line of natural carbonated drinks sold in cans and marketed as "Hansen's Soda." Hansen Foods used Hubert's name, his picture, and his

_____

[7] Apparently, there was no written contract providing Hansen's Juices with the right to use Hubert's name and story. Instead, the permission was granted orally.

story in brochures and commercials. Tim grew Hansen Foods into a profitable business with $50 to $60 million in annual sales.

However, in 1988, Hansen Foods experienced financial difficulties and filed for Chapter 11 bankruptcy. Hansen Foods was unable to successfully reorganize its business and ultimately sold "substantially all assets" to California CoPackers (CoPackers) in July 1989 as part of a bankruptcy order, which included a detailed asset transfer and incorporated various written agreements (1989 Bankruptcy Order). Among other things, CoPackers paid $14 million[8] to purchase "[a]ll intangible personal property including, but not limited to, labels, patents, trade secrets and proprietary know-how (whether or not in written form), formulas, distribution rights, customer lists, chattel paper, trademark rights and trademark license rights, licenses, contract rights and good will and other general intangibles related to Hansen's business[.]"

In 1992, CoPackers sold its assets to Unipac, a company formed by Rodney Sacks and Hilton Schlosberg. The sale was pursuant to a written asset purchase agreement (1992 Asset Purchase Agreement), calling for the sale of CoPackers's entire business, including "all of [CoPackers's] then existing properties, assets and business as a going concern of every kind and nature, personal or mixed, tangible or intangible, wherever located, and

---

[8] Both parties assert that CoPackers paid the $14 million. However, based on the record, of the $14 million paid, it appears CoPackers paid $1.5 million and the Rabin Brothers paid $12.5 million. Apparently, CoPackers and the Rabin Brothers entered into an agreement whereby the Rabin Brothers agreed to lease and give CoPackers the right to purchase its interest in the assets purchased from Hansen Foods. The parties do not mention the Rabin Brothers in their respective briefs; thus, it does not appear that they played any role in the underlying dispute. Therefore, we will not discuss them further.

whether on or off the books of [CoPackers] relating to the business of [CoPackers]." Sacks and Schlossberg saw an opportunity to grow a "niche" product into a national brand, given the 60-year history and the authenticity of Hansen's products. As part of that plan, Unipac formed a subsidiary to run the new business it acquired from CoPackers. The subsidiary was named Hansen Beverage Company (Hansen Beverage).[9]

Although Hansen Foods was no longer in business, Hansen's Juices was continuing to operate during this time. As such, both Hansen's Juices and Hansen Beverage were selling products using the Hansen name. To clarify their respective rights, the two companies agreed to put all their intellectual property relating to the Hansen name into the Hansen's Trust dated July 27, 1992, and then create licensing agreements defining how the intellectual property would be used. At the Hansen's Trust's inception, two of the three trustees, Gary Hansen and Anthony Kane, were members of the Hansen family and Kane was the president of Hansen's Juices. During the time Gary was a trustee, Hansen Beverage was using Hubert's name and the company story on its labels, without objection.

The Hansen's Trust was amended three times. In the first amendment, made in July 1996, Hansen's Juices and Hansen Beverage agreed to assign their respective intellectual property rights to the trust, to the extent they had not already done so, and to change trustees. With this amendment, Gary and Sacks became the trustees.

In December 1996, Hansen's Juices merged into the Fresh Juice Company (Fresh Juice). Nearly three years later, in exchange for $775,010,

---

9    After Hansen Foods sold its assets to Unipac, Tim Hansen worked extensively with Hansen Beverage for more than two decades, from 1994 until mid-2016.

Fresh Juice assigned all of its rights, licenses, and other interests to Hansen Beverage. In the subject contract, Fresh Juice represented that it was not aware of any third party that had any rights in its intellectual property and promised to cooperate as necessary to effect the transfer to Hansen Beverage of all intellectual property that Fresh Juice held.

In March 2000, the Hansen's Trust was amended a third time to reflect Fresh Juice's sale of its rights to Hansen Beverage. Following that sale, Hansen Beverage owned all the assets in the trust, and the Hansen's Trust was dissolved.

In late 2009, Hansen Beverage employee Blair Owens had the idea to create a lemonade brand. Owens was looking for a unique brand name, and he ultimately chose the name "Hubert's," having seen the name "Hubert" on juice labels and in internal presentations about the Hansen company history. His "brief" for the product proposal discussed the authenticity of the "Hansen's" brand, and stated that "Hubert's" was "a unique name likely to stand out" that was also "authentically rooted in its founding." Hansen Beverage trademarked "Hubert's" in 2011.

The back of some Hubert's Lemonade labels included "romance copy" mentioning the company history, including Hubert's practice of selling juices from a truck and/or at studio lots. Similar romance copy also appeared on the back label of Hansen Beverage's juices. Later versions of the labels omitted specific references to Hubert but mentioned or pictured a truck. Some labels also included a slogan, "Only the best will do."[10] The icon or logo for

---

[10] Although this quote sometimes was attributed to Hubert, at trial, there was no evidence presented that Hubert ever actually said those words. Instead, the quote was a creation of Hansen Beverages.

Hubert's Lemonade, which appeared on the front of the bottle, was a picture of the face of a cartoon lemon character, not a picture of Hubert.

While Hansen Beverage was launching Hubert's Lemonade, it also developed a new energy drink, which became very successful. Consequently, Hansen Beverage changed its name to Monster Energy, sharing the name of the company's new energy drink.

At this time, members of the Hansen family were not actively involved in the beverage industry and were not aware of the extent to which Monster Energy was using Hubert's name or story in connection with its products. However, sometime in 2014 or 2015, Jeanne first saw Hubert's Lemonade in a supermarket. Soon thereafter, Jeanne saw a large yellow truck on the freeway with Hubert's name on it. Then the Hansen family consulted an attorney and learned about the right of publicity under section 3344.1. Yet, at that time, no one in the Hansen family took any action against Monster Energy to make a claim based on their interest in Hubert's right of publicity.

In 2014, Monster Beverage and Coke began negotiating a deal that involved (among other things) a transfer of certain brands. The deal's terms were set forth in an asset transfer agreement dated August, 2014. The deal would not be final until the closing conditions were met, but the deal terms were made public, including its $2.1 billion estimated value on the day of the signing of the agreement.

On February 26, 2015, before the Monster/Coke deal was completed, counsel for certain Hansen family members sent a letter to Sacks, who was chairman and chief executive office of Monster Beverage at the time, stating that certain Hansen family members had the sole right to use Hubert Hansen's name and likeness and asked Sacks to "clarify . . . on what basis Monster [was] using Hubert Hansen's name and likeness."

9

On March 1, 2015, certain Hansen family members established the Trust. The trustees were Tim and his two sisters Jeanne and Maureen Todd. Except for Krikorian, all those members of the Hansen family who claimed an interest in a right of publicity deriving from Hubert then sold or assigned their interest to the Trust.

Some three weeks later, on March 23, 2015, counsel for certain Hansen family members sent another letter to counsel for Monster Beverage, explaining that those Hansen family members believed they had the right to Hubert's name and likeness per section 3344.1 and Monster Energy was not authorized to use Hubert's name or life story in connection with its products. Alternatively stated, these family members argued that Hansen Beverage used Hubert's name and his story without permission from anyone in the Hansen family.

On April 8, 2015, Monster Energy filed a registration of claim as successor in interest under section 3344.1 with the California Secretary of State, averring that it made its claim under a contract. Moreover, Monster Energy claimed a 100 percent interest in Hubert Hansen's "[n]ame only."

On June 5, 2015, the trustees of the Trust filed a registration of claim as successor in interest under section 3344.1 with the California Secretary of State. In the registration, the trustees claimed a 100 percent interest in the use of " 'Hubert's', 'Hubert Hansen', 'Hubert', 'Hub', 'his voice, signature, photograph, and likeness.' " Further, the trustees claimed to acquire their right by contract (i.e., the Trust).

The trustees and Monster Energy could not resolve their dispute; thus, in June 2016, Respondents brought suit in San Diego Superior Court against Monster Beverage and Coke, alleging causes of action for misappropriation of right of publicity and declaratory relief. Monster Beverage and Coke

10

removed the suit to federal court, but the district court ultimately remanded the matter back to superior court. Respondents eventually filed a second amended complaint, which added Monster Energy and Nexstep as doe defendants.

The matter proceeded to a bifurcated trial wherein the court presided over the declaratory relief claim to determine whether Monster Energy's registration of claim was valid. In answering this question in the negative, the trial court found Hubert's publicity rights did not become an asset of Hansen's Juices or Hansen Foods but, rather, became the property of Hubert's heirs when he died in 1951. As such, the court declared that the Trust and Krikorian owned Hubert's rights of publicity. Although the court found that Respondents were the prevailing parties at the first phase of the trial, the court explicitly noted it did not make any decisions on any affirmative defenses as well as any of the following issues: "1. Whether Hubert Hansen was a natural person whose name or likeness had commercial value at the time of his death; [¶] 2. Whether [Appellants'] use of Hubert Hansen's right of publicity was directly connected to [Appellants'] commercial purpose; [¶] 3. Whether [Respondents] were harmed; [¶] 4. Whether [Appellants'] conduct was a substantial factor in causing [Respondents'] harm; or [¶] 5. Whether [Respondents] suffered any damages, and if so, how much."

At the second phase of the trial, the jury answered these questions in favor of Respondents and awarded them a total of $9,596,450.98 in damages.

Appellants timely appealed.

11

## DISCUSSION

### I

### SECTION 3344.1

The fulcrum of the dispute between the parties in the instant matter is Hubert's right of publicity. "The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility." (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 399 (*Comedy III*); see *Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest* (2011) 198 Cal.App.4th 781, 788 (*Aroa Marketing*) ["the right of publicity is an intellectual property right"].)

"In this state the right of publicity is both a statutory and a common law right." (*Comedy III*, *supra*, 25 Cal.4th at p. 391.) The statutory right originated in section 3344, enacted in 1971, which allows recovery of damages by any living person whose, name, photograph, or likeness has been used for commercial purposes without his or her consent. Eight years later, our high court recognized a common law right of publicity, which the statute was said to complement. (See *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 818 (*Lugosi*).) However, because the court determined that the common law right was derived from the law of privacy, it concluded that the cause of action in *Lugosi* did not survive the death of the person whose identity was exploited and was not descendible to his or her heirs or assigns. (*Id.* at pp. 819-821.)

"In 1984 the Legislature enacted an additional measure on the subject [section 990], creating a second statutory right of publicity that *was* descendible to the heirs and assignees of deceased persons. (Stats. 1984, ch. 1704, § 1, p. 6169.) The statute was evidently modeled on section 3344: many of the key provisions of the two statutory schemes were identical."

12

(*Comedy III*, *supra*, 25 Cal.4th at pp. 391-392.) Effective January 1, 2000, section 990 was renumbered as section 3344.1. (Sen. Bill No. 209 (1999-2000 Reg. Sess.) ch. 998.)

Section 3344.1 declares broadly that "[a]ny person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof." (§ 3344.1, subd. (a)(1).) The amount recoverable includes "any profits from the unauthorized use," as well as punitive damages, attorney fees, and costs. (*Ibid*.)

The statute defines "deceased personality" as a person "whose name, voice, signature, photograph, or likeness has commercial value at the time of his or her death," whether or not the person actually used any of those features for commercial purposes while alive. (§ 3344.1, subd. (h).) In addition, the statute explicitly states that a deceased personality includes, "without limitation, any such natural person who had died within 70 years prior to January 1, 1985." (*Ibid*.)

The statute further declares "[t]he rights recognized under this section are property rights" that are transferable before or after the personality dies, by contract or by trust or will. (§ 3344.1, subd. (b).) Consent to use the deceased personality's name, voice, photograph, etc., must be obtained from such a transferee or, if there is none, from certain described survivors of the personality. (*Id*., subds. (c), (d).) Any person claiming to be such a transferee or survivor must register the claim with the California Secretary of State before recovering damages under the statute. (*Id*., subd. (f).)

13

In 2008, " 'to prevent needless litigation[,]' " section 3344.1 was amended to clarify that the Legislature had intended for the law to be applied retroactively. (See *Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 608; see *id.* at pp. 605-608 [discussing legislative history of the 2008 amendment]; § 3344.1, subd. (p) ["The rights recognized by this section are expressly made retroactive, including to those deceased personalities who died before January 1, 1985"].)

## II

## PHASE ONE OF THE TRIAL

### A. Appellants' Contention Regarding Bifurcation

Appellants contend the trial court abused its discretion in granting Respondents' request to bifurcate the trial. We disagree.

### B. The Trial Court's Decision to Bifurcate

In the operative complaint, Respondents alleged a cause of action for declaratory relief. In that claim, they asked the court to determine whether their registration of claim as successor in interest under section 3344.1 or Appellants' registration of claim as successor in interest under section 3344.1 was valid. In addition, Respondents filed a motion in limine to bifurcate the trial to allow the court to first determine the declaratory relief action. To this end, Respondents maintained they were seeking equitable relief and, thus, the court rather than a jury should be the trier of fact, determining the credibility of witnesses, weighing the evidence, and determining the intent of the contracting parties. (See *Walton v. Walton* (1995) 31 Cal.App.4th 277, 287; *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 285; *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671.) Respondents further argued that if they proved successful at the first phase of the trial then the jury would be instructed that Respondents had been determined to be the

14

owner of Hubert's right of publicity, and the jury would then decide the remaining legal issues. If Respondents were unsuccessful in the first phase, then there would be no need for a second phase.

Appellants opposed bifurcation of the declaratory relief claim. They argued the question of who owned Hubert's right of publicity was a necessary and dispositive element of Respondent's primary cause of action for misappropriation of the right of publicity under section 3344.1. By bifurcating and determining the ownership—binding the jury with the court's ownership determination—Appellants maintained they would be deprived of their constitutional right to a jury trial on the misappropriation claim.[11]

In the trial court's written tentative ruling, it framed the issue presented by Respondents' motion in limine as follows: "Count 2 of the SAC seeks a declaration by the court as to which of the competing 2015 'Successor-In-Interest Registrations' under Civil Code section 3344.1 is valid. This question is, in turn, bound up in the question whether the 1992 'Asset Purchase Agreement' transferred Hubert Hansen's publicity rights to [Appellants] (as they contend)." Thus, the court clearly viewed the ownership determination as one of contract—whether the 1992 Asset Purchase Agreement transferred Hubert's right of publicity, or, at least, allowed Appellants to use Hubert's right of publicity in connection with the products and assets they had purchased from the two Hansen companies. Consistent with this framing, the court observed that if the relevant contracts were ambiguous and interpretation involved the determination of the credibility of

---

[11]    Despite advancing this argument below, Appellants do not claim on appeal that the court deprived them of their right to a jury trial to determine ownership of Hubert's right of publicity. As such, we do not consider this issue here.

15

extrinsic evidence then the jury would make that determination. However, the court stated, "the threshold question of ambiguity, and the presence or absence of conflicting extrinsic evidence, [should] be addressed first, without a jury." Finally, the court noted that Appellants had previously tried to resolve the ownership issue of Hubert's right of publicity without a jury (by bringing a motion for summary judgment) and that it agreed with Respondents that their declaratory relief action was akin to a quiet title action.

During oral argument regarding Respondent's motion in limine to bifurcate the trial, the court explained its tentative ruling as establishing a first phase for the court to decide "what the contracts did or did not say." The court explained:

> "[Respondents] want declaratory relief on the issue of whose registration is effective. Bound up in that is what [Appellants] purchased . . . in the two transactions that are at issue, one out of bankruptcy and one had assets; right? [¶] I have to look at those contracts once they're in evidence and discern whether I think there is ambiguity; and if there is ambiguity, receive conditionally evidence on how to clear up that ambiguity. If I find there is no ambiguity, I go down one path. If I find there is ambiguity, I go down another path. If I find that clearing up that ambiguity requires me to make credibility determinations, I stop, I give that to the jury a second time."

The court also clarified that the issue of "ownership" was to be decided in the first phase. Over Appellants' arguments that ownership should be determined by the jury, the trial court affirmed its tentative ruling as to Respondents' motion in limine to bifurcate the trial.

### C. Analysis of the Bifurcation Issue

A trial court has broad discretion to order bifurcation in the interest of justice, and we will not disturb its discretion on appeal absent a manifest

16

abuse of that discretion.  (*Royal Surplus Lines Ins. Co. v. Ranger Ins. Co.* (2002) 100 Cal.App.4th 193, 205.)  Code of Civil Procedure section 598[12] provides for the bifurcation of issues at trial in the interest of economy and efficiency.  "Its objective is avoidance of the waste of time and money caused by the unnecessary trial of damage questions in cases where the liability issue is resolved against the plaintiff."  (*Horton v. Jones* (1972) 26 Cal.App.3d 952, 955.)

In claiming the court abused its discretion in bifurcating the trial, Appellants dedicate a single paragraph of their 76-page opening brief.  They argue that the declaratory relief action asked the court to determine which registration under section 3344.1 was valid but note that the existence of multiple registrations is not improper.  Further, they assert the trial court was wrong to focus on the issue of ownership because "a valid claim [under section 3344.1] need not involve 'ownership' at all[.]"

Although we agree with the concept that multiple registrations are not necessarily improper, we observe that the court anchored its decision to bifurcate the trial on the threshold issue of determining any ambiguity and the existence of any extrinsic evidence for the interpretation of the various asset purchase agreements.  Such an approach appears practical and

---

12    Code of Civil Procedure section 598 provides, in relevant part:  "The court may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby, on motion of a party, after notice and hearing, make an order, no later than the close of pretrial conference in cases in which such pretrial conference is to be held, or, in other cases, no later than 30 days before the trial date, that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to Sections 597 and 597.5.  The court, on its own motion, may make such an order at any time."

efficient.  Appellants claimed the right to use Hubert's name by way of contract.  In general, a court, not a jury, interprets a contract.  (See *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126 (*Wolf*) ["The interpretation of a contract is a judicial function"].)  And, the court made clear, in responding to Appellants' argument against bifurcation of the declaratory relief action, that it believed it should first interpret the contracts at issue before calling a jury.  Moreover, the court noted that if it found for Appellants on the contract issue then there would be no need to proceed to a jury trial because Respondents' claims would necessarily fail.

On the record before us, we cannot say such a decision was an abuse of discretion.  Indeed, this matter appears to be a classic case for severance under Code of Civil Procedure section 598, at least considering the contract issue as framed by the court.  The declaratory relief claim was focused on a single issue, the estimated length of a jury trial was 20 days, and, as the trial court observed, Appellants did not claim that the trial time savings suggested by Respondents in their motion in limine was "unrealistic."  In addition, Respondents admitted that a declaratory judgment in favor of Appellants would end their case, and there would be no need to proceed to a jury trial, further supporting the trial court's bifurcation of the trial.  (See *Equitable Life Assurance Society v. Berry* (1989) 212 Cal.App.3d 832, 836.)

### D.  Appellants' Contentions Regarding the Interpretation of the Asset Transfers

In addition to arguing the trial court abused its discretion in bifurcating the proceedings, Appellants insist the court erred in interpreting the asset transfers as a matter of law.  Indeed, they assert the court "should have found for [Appellants] as a matter of law[ ] because the contracts transferred all intellectual property that had been held by [Hansen Foods] and [Hansen's Juices] to [Appellants]."  They also argue the trial court's

interpretation of the contracts retroactively deprived them of the benefits for which they contracted in violation of the Contracts Clause of the United States Constitution.

We agree with Appellants that the trial court erred in interpreting the asset transfers. As we explain *post*, during phase one, the trial court admitted conflicting extrinsic evidence and made credibility determinations. Such decisions are the province of the jury. (See *City of Hope Nat. Medical Center v. Genetech, Inc.* (2008) 43 Cal.4th 375, 395 ["when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury"].) However, we stop short of agreeing with Appellants that the trial court should have found for Appellants as a matter of law.

E. The Trial Court's Interpretation of the Asset Transfers

Phase one began on November 18, 2019, with oral argument on motions in limine and opening statements. Evidence began the next day and concluded before noon on November 25. In all, the court heard from 20 witnesses and "was exposed to dozens of exhibits." Despite the number of witnesses and exhibits presented during the first phase, we focus on the evidence presented regarding the asset transfer agreements as Appellants claim error as to the trial court's interpretation of them.

Evidence was offered at trial that Hubert's descendants had used Hubert's publicity rights to advertise and promote Hanson's Juices and Hansen Foods. Specifically, Hubert's " 'name, photograph, likeness, identity, and/or persona were used at certain times during the 1980s with permission

19

in marketing brochures for Hansen's Juices . . . and Hansen[ ] Food . . . ." Part of Appellants' theory of their case was that they had acquired all the assets, intellectual property, intangible property, and rights of both Hansen's Juices and Hansen Foods. Because those two companies used Hubert's name and story, Appellants believed they had purchased the right to do so as well through the subject asset purchase agreements. However, according to the testimony at trial, oral permission was granted for these uses before Appellants had acquired the assets of the Hansen companies, and there is no evidence in the record that any such permission was reduced to writing. Further, the permission granted was only given to the individual asking for permission. Permission was not granted to the company in general (although Hubert's publicity was used by either Hansen's Juices or Hansen Food). That said, there was some disagreement between trial testimony and discovery responses regarding the scope of the permission granted as well as whether it was the company or an individual who received permission to use Hubert's publicity.

In addition, in the early 2000's, some decedents of Hubert started a company called "Hub's Family Juice Company." Hub was a family nickname for Hubert. And Jeanne testified that she was asked permission to use the name Hubert and talked to other family members to ensure they gave their permission to use Hubert's name as well in connection with this new company. However, Hubert did not fit on the label so the company shortened the name to Hub. In addition to using the name Hub's on the product labels, the labels also included the story of Hubert's business. Like previous other uses by the Hansen companies and relatives of Hubert's name and story, the permission does not appear to have been reduced to writing. Further, there is no indication that there was any payment made to use Hubert's name.

20

Appellants' claim the right to use Hubert's name and story predominately based on two transactions: the 1989 Bankruptcy Order and 1992 Asset Purchase Agreement.

During phase one, the trial court took judicial notice of the 1989 Bankruptcy Order. Although the subject order describes a somewhat complicated deal that includes the assumption of assets, an additional buyer, and a lease with an option to purchase, the trial court and the parties focused on what CoPackers acquired from Hansen Foods. The assets purchased included all "accounts receivable[,]" "all inventory[,]" "all intangible personal property including, but not limited to, labels, patents, trade secrets and proprietary know-how (whether or not in written form), formulas, distribution rights, customer lists, chattel paper, trademark rights and trademark license rights, licenses, contract rights and good will and other general intangibles related to [Hansen Food's] business[.]" The 1989 Bankruptcy Order also included an agreement wherein Hansen's Juices, Richard Hansen, Vincent P. Hansen, Thomas P. Hansen, and Anthony Kane transferred to CoPackers "all of the right, title and interest of Hansen['s] Juices, Inc. (and Richard[ ] Hansen, Vincent P. Hansen, Thomas P. Hansen and Anthony Kane) in and to the HANSEN's trademark, subject to a license back to Hansen['s] Juices, Inc. for the use of the HANSEN's trademark for fresh fruit juices having a shelf life of less than twenty-one days . . . ."

The 1992 Asset Purchase Agreement between CoPackers and Unipac, which later operated as Hansen Beverage, included a very broad provision to encompass all of CoPackers's assets:

> "[A]ll of [CoPackers's] then existing properties, assets and
> business as a going concern of every kind and nature,
> personal or mixed, tangible or intangible, wherever located,
> and whether on or off the books of [CoPackers] relating to

the business of [CoPackers] . . . including, without limitation, the following:

"[¶] . . . [¶] . . . [¶] . . . [¶] . . . [¶] . . . [¶] (g) (1) all Marks (as defined in subparagraph 6.12(a)) and registrations thereof and applications thereof, including, without limitation, [CoPackers's] right to use the name 'Hansen's' in connection with [CoPackers's] business, whether or not registered and wherever located, including, without limitation, any rights to the Hansen's Mark in Canada and Mexico; (2) all Copyrights (as defined in subparagraph 6.12(a)), industrial designs, and registrations thereof and applications therefor; (3) all formulae, processes, technologies, know-how and other intellectual property owned, used or held in connection with [CoPackers's] business; (4) all other Intellectual Property Rights (as defined in subparagraph 6.12(a)), including, without limitation, those set forth on Schedule 6.12 hereto; (5) all licenses and assignments, and renewals, modifications and extensions of the Marks and all other Intellectual Property Rights; (6) all claims or causes of action with respect to the ownership or use of the Marks or other Intellectual Property Rights; and (7) all rights under agreements to license or sublicense the Marks[.]"

In turn, subparagraph 6.12(a) of the 1992 Asset Purchase Agreement defined "Intellectual Property Rights" as follows:

"As used herein and as set forth or described on Schedule 6.12 hereto, 'Intellectual Property Rights' shall mean (i) all trademarks, service marks and brand names and trade names (including logos), whether or not registered, owned, used, licensed or held by [CoPackers] and all pending applications for any such rights (collectively, 'Marks'), including for each such Mark, the registration or application number, country, filing and expiration dates (if any) and classes(es) and, and for unregistered Marks not under application for registration, the products with respect to which they are used; (ii) all copyrights owned, used or held by [CoPackers] (collectively, 'Copyrights'); and (iii) all trade secrets, technology or know-how used in

22

connection with the Business. [CoPackers] does not own or license any patents or registered Copyrights or have any pending applications therefor used or usable in connection with the Business."

Sacks, who was the chairman of both Unipac and Hansen Beverage, signed the 1992 Asset Purchase Agreement. He testified that he believed he was purchasing "all of the rights relating to or encompassing[,] which in any way[,] affected the business." He also explained what he believed was meant by the phrase, "whether on and off the books." Sacks stated:

> "It meant to me that things that were—that were not recorded in a document but which existed in fact, in practice, that if you used anything in connection with the business, if it happened to be used, it was something that I needed and I wanted to ensure was—we acquired because we—again, we were not acquiring any hard assets, really, that you could—like a building that you could touch and feel and inspect.

> "This was—this was all the rights, the bundles of rights and assets and benefits that went to make up this brand and the history of the brand and what it was that we were buying and paying the 14 1/2 million for . . . ."

In addition, Sacks illuminated what he believed Unipac was acquiring regarding "marks" as defined in the 1992 Asset Purchase Agreement. He testified:

> "It was, again, everything that was in connection with the Hansen's name and the Hansen's marks. And, again, we were concerned to ensure that it was not limited to—to registered marks. So we made that clear, that it would be whether or not registered, anything, again, used with the name Hansen's relating to the business, registered or not registered, and wherever located, and then also included and expanded upon that all copyrights.

23

"Again, I believe it would be, registered or unregistered, all formulae, processes, technologies, and other—know-how, other intellectual property owned, used, or held in connection with the business, again, trying to make it as expansive as we could."

On cross-examination, Sacks claimed that he was not aware of the right of publicity at the time he signed the 1992 Asset Purchase Agreement, but thought that the language used in the agreement was "all encompassing and covered all rights, tangible, intangible, that covered the intellectual property of the business[.]" Although Sacks stated the first time he read about the right of publicity was in 2015, Respondents' counsel offered evidence during Sacks's cross-examination that Sacks had been involved in deals to purchase and/or sell assets that specifically mentioned the right of publicity, one in 2000 and another in 2014.

Yet, Sacks was not the only witness offered to aid the court in the interpretation of the relevant agreements. The parties also called expert witnesses to opine about custom and practice in licensing publicity rights. Respondents called Kevin Greene, a professor at Thomas Jefferson School of Law who teaches, writes, speaks, and researches about, among other topics, intellectual property, including the right of publicity. Greene explained that he was retained to review certain transactions, specifically the 1992 Asset Purchase Agreement, to determine, "pursuant to custom and practice of drafting and transactions if rights of publicity were transferred[.]" Greene opined that the right of publicity in the name of Hubert Hansen was not transferred "based on the custom and practice of acquiring and transferring rights." He explained that in terms of intellectual property transactions, it would be "very important" for the rights transferred to be "clearly articulate[d]." Greene further agreed that a "sophisticated drafts person" would not omit "key rights, such as the right of publicity," if the drafter

24

intended those rights to be conveyed.  He stated that he did not see any documents that indicated any right of publicity was transferred.  Essentially, Greene opined that if the parties had intended to include the right of publicity among the assets transferred, they would have specifically used the words "right of publicity."[13]

Appellants' expert witness was Jennifer Rothman.  Rothman is a professor at Loyola Law School who is known for her work in intellectual property and the first amendment.  She has written extensively about the right of publicity and is "recognized as the leading expert on the right of publicity."  She testified that she believed Greene was too focused on the 1992 Asset Purchase Agreement and should have considered more documents: "Certainly it needs to be read in the context of the initial bankruptcy order, but then there's the whole other line of corporations that flowed into what ultimately now are the—the defendants, and I didn't see him consider those at all."

Rothman also pointed out the Greene's opinion was very narrow, focusing only on whether the words "the right of publicity" appeared in the 1992 Asset Purchase Agreement "rather than considering broader transfers of intellectual property, which would encompass the right of publicity." Rothman further opined that within the type of deal at issue (purchasing "a whole company") she would expect a "very broad" intellectual property transfer to avoid leaving "anything out," and, as such, the subject agreement included expansive language like "without limitation."

---

13    Greene's testimony was concise.  The trial court noted he provided "about 8 minutes of substantive testimony," and Appellants did not cross-examine him.

Additionally, Rothman testified that, in 1992, it would not have been industry practice to use the terms "right of publicity" in a purchase agreement like the one at issue. Rothman explained she would not have expected to see the specific phrase "right of publicity" because: (1) "the right of publicity was not at the forefront of people's minds at this time"; (2) the agreement covered a "broad sale of a company" so a "broad transfer[ ] of intellectual property rights . . . would capture the rights of publicity"; (3) the transfers included transfers of whatever rights the business had; and (4) Hubert already had passed away at the time the deal was negotiated and it was unclear whether the right of publicity would even attach to him. Also, Rothman explained that when a purchaser buys "a company that's named after a particular person" the purchaser "would expect that person's name and identity" would transfer along with "trademarks and goodwill."

In addition, Rothman addressed the transfer of assets contained in the 1989 Bankruptcy Order. She observed that all intangible personal property was transferred, which "include[d] broadly any intellectual property that was held by the bankrupt company." She explained if Hansen Food had the right to use Hubert's publicity, the broad language of the bankruptcy order "would have transferred certainly the use of [Hubert's] name and identity in the context of th[e] business transferred." Rothman enumerated some examples of the types of intangible property that would be included under the words " 'all intangible personal property, including, but not limited to' ": "[I]t picks up intangible or intellectual property they have, including patents, trade secrets, proprietary know-how, trademark rights, trademark licenses, any other licenses, any other contract rights and goodwill, and any other general intangibles related to Hansen's business." Rothman also testified that,

during the subject time period, the industry practice was for right of publicity to be considered intellectual property and an intangible right.

Ultimately, Rothman opined that the 1992 Asset Purchase Agreement had language consistent with the industry practice for acquiring the use of Hubert Hansen's name. She reiterated that if the right of publicity was held by CoPackers, the language of the 1992 Asset Purchase Agreement would have encompassed such a right, especially because Hubert's name and likeness were used in the context of the business.

In the trial court's very thorough statement of decision, the court addressed the use of Hubert's publicity by Hansen's Juices and Hansen Food. The court stated:

> "The evidence preponderates in favor of a finding that Hubert Hansen's publicity rights did not become an asset of either Hansen's Juices, Inc. or Hansen Foods. The fact that there were sporadic uses of Hubert Hansen's likeness and name and history by the two entities over the history of the two companies did not, in the court's view, create a property interest in Hubert Hansen's right of publicity. Use within the family (or even within enterprises bearing the family name), with express or tacit permission, did not, in the court's view, transmute the publicity right into property of the companies. The owners of the companies were not all the same people who had the ownership rights to Hubert Hansen's right of publicity; only the owners of the rights could transfer or license them. Timothy Hansen testified the permissions he received were personal to him."

Therefore, the court found that certain heirs of Hubert owned his right of publicity by right of descent. Further, it concluded that neither Hansen's Juices nor Hansen Foods had any ownership in Hubert's right of publicity; thus, the companies could not transfer such right in any asset purchase agreement. In reaching this conclusion, the court resolved a dispute between conflicting extrinsic evidence, which ultimately impacted the interpretation of

27

the asset transfer agreements. Appellants offered evidence that Hansen's Juices and Hansen Foods used Hubert's name and story in selling and marketing their products, but the court found credible Respondents' evidence that only certain individuals at the company had permission to personally use Hubert's right of publicity, and therefore, the companies never acquired any interest in that right.

In interpreting the two asset transfers, among other evidence, the trial court considered the testimony of the expert witnesses. To this end, it noted that the experts agreed on the "key point" that none of the documents contained the words "rights of publicity." The court then made a credibility determination to disregard the opinion of Appellants' expert witness. The court explained:

> "Professor Rothman (who did not practice law during the time period she was opining on, having not finished law school until 2002) testified that she would not expect to see the right of publicity expressly referenced in the 1989-1999 documents because the law was not clear until 2007 whether the right of publicity was retroactive. The court reaches the opposite conclusion. A fact finder is not required to accept an expert's opinion. As with any other witness, it is up to the fact finder to decide whether to accept the expert's testimony and choose whether to use it as a basis for decision."

The court found Respondents' expert, Greene, more credible than Rothman. In noting the uncertainty regarding the retroactivity of section 3344.1 at the time the contracts were negotiated and executed, the court found: "A skilled drafter in 1989-1999 would have resolved the uncertainty and eliminated all doubt by including the language 'rights of publicity' *if that had been the intention of the parties.*" This finding mirrors Greene's opinion during his trial testimony that a "sophisticated drafts person" would have included the phrase "right of publicity" instead of just the

28

broader reference to all intellectual property if the parties intended to transfer the right of publicity. Moreover, the court also considered other contracts Sacks signed in 2000 and later that explicitly referenced "rights of publicity and privacy" to buttress its finding.

In addition, the trial court made clear that it did not find any ambiguity in the contracts offered by Appellants: "The court finds all of the documents used by [Appellants] to support their claim of ownership of the Hubert Hansen right of publicity to be unambiguous: none of them transferred the right of publicity to [Appellants]."

The court ultimately found that the Trust owned 90 percent of Hubert's right of publicity and its registration under section 3344.1 was valid. Consequently, the court determined Monster Energy's registration under section 3344.1 was void.

## F. Relevant Law

" 'The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.' " (*Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432 (*Brown*), quoting *Wolf, supra*, 162 Cal.App.4th at pp. 1125-1126.)

"Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." (Code Civ. Proc., § 1856, subd. (a); accord, *Brown, supra*, 34 Cal.App.5th at p. 432 [" 'The court generally may not consider extrinsic

evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.' "].) " 'Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous.' " (*Brown*, at p. 432; see *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 39-40 [notwithstanding the plain and unambiguous language on the face of a contract, if extrinsic evidence is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible," the extrinsic evidence may be admitted to determine the contracting parties' objective intent].)

"When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process. First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." (*Wolf*, *supra*, 162 Cal.App.4th at p. 1126; see *Brown*, *supra*, 34 Cal.App.5th at pp. 432-433; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).) If the extrinsic evidence creates such a question of fact, the jury must decide that question before the contract can be interpreted. (*Wolf*, at p. 1127.)

30

The custom and practice in an industry is a fact that is relevant to the interpretation of a contract and may inform its meaning.[14] (*Ecco–Phoenix Electric Corp. v. Howard J. White, Inc.* (1969) 1 Cal.3d 266, 271; *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114; *Midwest TV v. Scott, Lancaster, Mills & Atha* (1988) 205 Cal.App.3d 442, 451.) In accordance with the rules stated above, if evidence regarding custom and practice is in conflict, the jury must resolve the conflict before the contract is interpreted. If such evidence is not in conflict, however, and there is no other conflict in the extrinsic evidence, the interpretation of a contract in light of the custom and practice, and in light of any other extrinsic evidence, is a question of law for the court alone to decide.

On appeal, a "trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus[,] the threshold determination of ambiguity is subject to independent review." (*Winet, supra*, 4 Cal.App.4th at p. 1165; see *Brown*, *supra*, 34 Cal.App.5th at p. 433.) The "ultimate construction placed upon the ambiguous language . . . may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet*, at pp. 1165-1166.)

---

[14] How particular terms are used or interpreted within a particular industry is a type of extrinsic evidence that may establish an ambiguity in the language of a written instrument. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1355.) Indeed, parties are presumed to contract pursuant to a fixed and established usage and custom of the trade or industry (*Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550), and contract terms must be interpreted according to any special meaning given to them by usage, and technical terms are interpreted as generally understood in the industry (§§ 1644, 1645).

G. Analysis of Contract Interpretation Issues

The primary dispute between the parties during phase one was whether the subject transactions conveyed Hubert's right of publicity or otherwise allowed Appellants to use Hubert's name and story in connection with their products. Appellants maintained they had a right to use Hubert's name and story. Respondents argued they did not. The court admitted extrinsic evidence to aid in the interpretation of the contracts. Appellants contend the court erred in making credibility determinations while considering conflicting extrinsic evidence. Respondents counter that the court did not need to consider the extrinsic evidence because the court made a "critical ruling" that " 'all of the documents used by [Appellants] to support their claim of ownership of [Hubert's] rights of publicity are unambiguous: none of them transferred the rights of publicity to [Appellants].' " Appellants have the better argument.

It is undisputed that neither the 1989 Bankruptcy Order nor the 1992 Asset Purchase Agreement contained the phrase "right of publicity." But the lack of this phrase does not end our inquiry into the trial court's interpretation of the contracts. Because Appellants offered extrinsic evidence, we must analyze whether the proffered extrinsic evidence was relevant to prove a meaning to which the instruments were reasonably susceptible. (See *Wolf*, *supra*, 162 Cal.App.4th at p. 1126; *Winet*, *supra*, 4 Cal.App.4th at p. 1165.)

During phase one, Appellants asserted that the broad language of the 1989 Bankruptcy Order ("all intangible personal property including, but not limited to . . . trademark rights and trademark license rights, licenses, contract rights . . . and other general intangibles related to [Hansen Food's] business)" and the 1992 Asset Purchase Agreement ("all of [CoPackers's] then

32

existing . . . assets . . . of every kind and nature . . . tangible or intangible, wherever located, and whether on or off the books . . . relating to the business of [CoPackers] . . . including, without limitation . . . .") encompassed the right of publicity.  In other words, Appellants maintain that phrases like "intellectual property," "all intangible personal property," and "general intangibles" included the right of publicity.  We agree that the broad language in the subject transactions is susceptible to such a meaning.

The right of publicity is a type of intellectual property.  (See *Comedy III, supra*, 25 Cal.4th at p. 399; *Aroa Marketing, supra*, 198 Cal.App.4th at p. 788.)  Therefore, it would not be unreasonable to conclude the reference to "other intellectual property" along with the other broad language in the 1992 Asset Purchase Agreement could include the right of publicity.

As the trial court noted in its statement of decision, the parties did not provide any California authority concluding that "intangible personal property" or "other general intangibles" include statutory rights of publicity. They also did not provide any such authority in this appeal.  Our independent research did not discover any as well.  That said, we are not troubled by the lack of authority on this single issue.  "Intangible" is defined as "not tangible:  impalpable" or "an asset (such as goodwill) that is not corporeal."[15]  In the context of California tax law, courts have defined intangible property " ' "as property that is a "right" rather than a physical object." ' "  (*Microsoft Corp. v. Franchise Tax Bd.* (2012) 212 Cal.App.4th 78, 88; *Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 208.)

---

15    (See <https://www.merriam-webster.com/dictionary/intangible> [as of June 17, 2021], archived at <https://perma.cc/AR4Q-8EXY>.)

Moreover, in the context of the 1989 Bankruptcy Order, the phrase "intangible personal property" was followed by the words "including, but not limited to" and the list of specific types of intangible property that followed included certain types of intellectual property, like patents, trade secrets, and licenses. The inclusion of intellectual property as part of a list of kinds of intangible property makes sense. (Cf. *Coast Hematology-Oncology Associates Medical Group, Inc. v. Long Beach Memorial Medical Center* (2020) 58 Cal.App.5th 748, 756 ["intellectual property is intangible"].) And because the 1989 Bankruptcy Order states that the specific list of intangible personal property was not all inclusive and the list included some intellectual property, the terms "intangible personal property" and "other general intangibles" is language reasonably susceptible to include the right of publicity. (See *Wolf, supra*, 162 Cal.App.4th at p. 1126.)

Having determined that the language of the subject contracts is reasonably susceptible to the meaning urged by Appellants, we turn to the extrinsic evidence considered by the court. In support of Appellants' interpretation of the contracts, they offered Sacks's testimony regarding what he believed was being acquired under the language of the contracts.

Further, Appellants offered Rothman who opined that when a purchaser buys "a company that's named after a particular person," the purchaser "would expect that person's name and identity" to transfer along with "trademarks and goodwill." Rothman further opined that the broad language of the contracts captured the right of publicity and, at the time the contracts were negotiated and signed, it was not the custom and practice of the industry to specifically refer to the right of publicity as opposed to intellectual property in general. Finally, Rothman also opined that if Hansen Food had the right to use Hubert's publicity, the broad language of the

34

bankruptcy order "would have transferred certainly the use of [Hubert's] name and identity in the context of th[e] business transferred."

In support of their position that the contracts did not transfer Hubert's right of publicity, Respondents offered the testimony of their expert, Greene, who opined that it was the custom and practice of the industry at the time the subtract contracts were executed to explicitly set forth the phrase "right of publicity" if the parties intended to transfer that type of intellectual property. Respondents also called several witnesses who explained that they had used Hubert's name and story in marketing and advertising products sold by Hansen's Juices and Hansen Foods. However, the individuals testified that they always received oral permission (it was never in writing) to use Hubert's publicity, but the permission was limited to the individual and was not given to the company at large (despite the fact it was the company that used Hubert's name and story).

In reviewing the extrinsic evidence, at the very least, the expert opinions of Greene and Rothman were conflicting. And it is clear the court made a credibility determination, rejecting Rothman's opinion: "The court reaches the opposite conclusion. A fact finder is not required to accept an expert's opinion." Moreover, while the court did not find Rothman credible, it adopted part of Greene's opinion in its statement of decision, declaring: "A skilled drafter in 1989-1999 would have resolved the uncertainty and eliminated all doubt by including the language 'rights of publicity' *if that had been the intention of the parties*." This was error. When the extrinsic

evidence creates a material conflict, like in the instant action, the jury must resolve the conflict before the contract can be interpreted.[16] (*Wolf, supra,* 162 Cal.App.4th at p. 1127.)

However, during oral argument, Respondents maintained that the trial court's interpretation of the contracts did not matter because the court determined that Hubert's heirs owned his right of publicity. Therefore, neither Hansen's Juices nor Hansen Foods owned Hubert's right of publicity and could not transfer such right in any asset sale. In other words, with this factual finding, there was no reason for the court to even consider the asset purchase agreements. Moreover, Respondents pointed out that Appellants did not challenge the trial court's factual finding of ownership.

In response, Appellants conceded that they were not directly challenging the trial court's ownership finding. Instead, they argued that they were not claiming to own Hubert's right of publicity outright but, through the various asset purchases, they had acquired a right to use Hubert's name and story in connection with their products. To this end, Appellants emphasized that Hansen's Juices and Hansen Foods both used

---

[16] We summarily reject Respondents' argument that we need not consider the extrinsic evidence because the trial court determined the contracts were unambiguous. We review a trial court's determination of contract ambiguity de novo. (See *Winet, supra,* 4 Cal.App.4th at p. 1166; *Brown, supra,* 34 Cal.App.5th at p. 433.) As discussed *ante,* the 1989 Bankruptcy and the 1992 Asset Purchase Agreement contained broad language that could have encompassed a right of publicity. As such, we conclude the language was ambiguous and could be reasonably interpreted as argued by Appellants. Therefore, the conflicting extrinsic evidence bearing on the interpretation of the contracts created a question of fact for the jury. (*Wolf, supra,* 162 Cal.App.4th at p. 1127.) Our analysis does not change because the trial court made certain credibility determinations of the extrinsic evidence to conclude the contracts were not ambiguous.

Hubert's name and story in selling and marketing their products. In other words, Appellants contended they purchased a nonexclusive right to use Hubert's right of publicity in connection with the sale and marketing of Hansen products. The use of Hubert's name and story in connection with products sold by Hansen's Juices and Hansen Foods thus was additional extrinsic evidence relevant to the interpretation of the subject asset purchase agreements. Alternatively stated, Appellants believed that they had purchased all the rights, intellectual property, and intangible property owned by Hansen's Juices and Hansen Foods. Because those companies used Herbert's publicity, Appellants thought they had acquired the right to do the same through the asset purchase agreements.

This disagreement at oral argument between the parties highlights additional conflicting extrinsic evidence bearing on the interpretation of the subject contracts. Appellants assert terms like "intellectual property," "intangible personal property," and "other general intangibles" contained in the asset purchase agreements encompassed the use of Hubert's name and story because: (1) the right of publicity is intellectual property; (2) the two companies (Hansen's Juices and Hansen Foods) that sold their assets used Hubert's name and story to sell and/or market their products; and (3) Appellants acquired those rights. Respondents attempt to undercut this argument by offering evidence that neither Hansen's Juices nor Hansen Foods had permission to use Hubert's right of publicity, but, instead, limited oral permission was given to certain individuals. So, per Respondents' theory, the two Hansen companies could not transfer a right they never had. And the court believed the testimony offered by Respondents. In doing so, the court made an additional credibility determination impacting the interpretation of the subject agreements. This credibility determination of

extrinsic evidence as well was a question for the jury. (See *Wolf*, *supra*, 162 Cal.App.4th at p. 1127.) Framed in this light, the determination that the Trust owned Hubert's right of publicity does not prevent Appellants from prevailing on their theory that they had acquired the right to use Hubert's name and story in connection with their products, at least as it relates to what Appellants acquired from Hansen's Juices and Hansen Foods.

In addition, the conflicting extrinsic evidence offered to aid in the interpretation of the transactions undercuts the trial court's primary justification for bifurcating the trial: interpreting the contracts before empaneling the jury. Once the conflicting extrinsic evidence was offered, the prudent approach would have been to end phase one, empanel a jury, and move on to phase two. Such an approach is warranted because the declaratory relief action here was subsumed in Respondents' first cause of action under section 3344.1.

That statute gives a "deceased personality's" heirs and their assignees a cause of action against someone who uses the deceased person's "name, voice, signature, photograph, or likeness . . . on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent." (§ 3344.1, subd. (a)(1).) However, before a plaintiff can recover damages in an action under section 3344.1, subdivision (a), he or she must register a claim of right with the California Secretary of State. (See § 3344.1, subd. (f)(1).) Thus, to maintain their cause of action against Appellants, Respondents needed only to show that they filed the required claim. They would not have had to show that Monster Energy's registration of claim under section 3344.1 was invalid. Nonetheless, had Respondents then proved successful in phase two, the trial court necessarily would have granted them the requested declaratory relief

38

(indeed, that cause of action involved many of the same witnesses and much of the same evidence as was offered during phase two).

Finally, Appellants were prejudiced by the court's error. During phase two, Appellants were effectively prevented from arguing they had consent to use Hubert's name and story. They had claimed the consent came from the subject contracts. With the court's erroneous finding that the contracts could not have transferred to Appellants a right to use Hubert's name and story, Appellants were placed at a severe disadvantage in presenting their case to the jury. As Respondents argued to the jury, "[T]he judge looked at these contracts already in the first phase. That's what happened in the first phase. *Contracts don't give them any consent*, any rights at all. They don't own the rights. They don't have consent." (Italics added.) Further, the importance of the interpretation of the contracts cannot be ignored. As the parties agreed before trial, if Appellants' urged interpretation of the contracts prevailed in phase one, Respondents' case was over. Thus, any error in interpreting the contracts is of paramount importance. Therefore, this single error merits reversal of the judgment.[17]

## III

## SECOND PHASE

Although we reverse the judgment based on the trial court's error in resolving conflicting extrinsic evidence instead of presenting that question to

---

[17] Appellants also claim the trial court's interpretation violates the Contracts Clause of the Unites States Constitution. We decline to reach this novel argument for two reasons. First, we are reversing the judgment based upon the trial court's error in dealing with conflicting extrinsic evidence. Second, Appellants' theory is based on the conclusion that the subject contracts allowed them to use Hubert's right of publicity. We cannot make that determination on the record before us.

the jury, we also address one of Appellants' challenges to the second phase involving jury instructions in the event this case is retried.

## A. Appellants' Contentions

Appellants claim the trial court committed reversible error in instructing the jury regarding the statute of limitations and the single-publication rule. As we discuss *post*, the law on the application of the single-publication rule in product label cases is not very developed, and, on the record before us, we cannot determine if the special instruction that was given was legally erroneous.

## B. Statute of Limitations and the Single-Publication Rule

A claim based on the right of publicity is subject to a two-year limitations period. (Code Civ. Proc., § 339; *Christoff v. Nestle USA, Inc.* (2009) 47 Cal.4th 468, 472, 476, fn. 7 (*Christoff*).) Such a claim accrues at the time of publication, whether the plaintiff was aware of the publication or not. (*Christoff*, at pp. 482-483; see *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1247-1253 (*Shively*).)

Although the parties agree that two years is the proper statute of limitations for Respondents' claim here, the parties disagree regarding how to the apply the single-publication rule to the relevant statute of limitations. "The single-publication rule was created to address the problem that arose with the advent of mass communication from the general rule in defamation cases that 'each time the defamatory statement is communicated to a third person . . . the statement is said to have been "published," ' giving rise to a separate cause of action. [Citation.]" (*Christoff*, *supra*, 47 Cal.4th at p. 477.) In California, the single-publication rule is codified in section 3425.3, and provides that "[n]o person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded

upon any single publication . . . , such as any one issue of a newspaper or book or magazine."[18]  A cause of action that is governed by the single-publication rule accrues from the date of the " 'first general distribution of the publication to the public' " (*Shively*, *supra*, 31 Cal.4th at p. 1245), thereby " ' "spar[ing] the courts from litigation of stale claims" ' " filed years after an initial publication is issued. (*Christoff*, at p. 479.)  Thus, the single-publication rule prevents any meaningful application of the "discovery rule," which usually provides that a cause of action only begins to run from the time that the plaintiff knew or reasonably should have known that the cause of action had accrued. (*Id*. at pp. 482-483; *Shively*, at p. 1237.)

Our high court concluded the single-publication rule applies to a cause of action for unauthorized commercial use of likeness. (See *Christoff*, *supra*, 47 Cal.4th at p. 476.)  The claim at issue here, misappropriation of the right of publicity, is not unlike a claim for unauthorized commercial use of likeness and would fall under the "any other tort" language of section 3425.3. (Cf. *ibid*.)  Consequently, as the parties here agree, the single-publication rule applies to Respondents' claim under section 3344.1.

The limitations period on such a claim begins to run on the first distribution or publication of the challenged speech, thereby providing repose to the defendants by precluding stale claims based on old publications. (*Christoff*, *supra*, 47 Cal.4th at p. 479.)  Yet, it must be determined what

---

[18]    Section 3425.3 provides:  "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture.  Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."

constitutes a single integrated publication to trigger the limitations period. (*Id*. at p. 477.)  Additionally, a new cause of action arises upon "[a]ny subsequent republication or rebroadcast."  (*Traditional Cat Assn. v. Gilbreath* (2004) 118 Cal.App.4th 392, 395; *Shively*, *supra*, 31 Cal.4th at p. 1245 [repetition of tortious statement in new publication gives rise to new cause of action with new accrual date].)  "A statement in a printed publication is republished when it is reprinted in something that is not part of the same 'single integrated publication.' "  (*Yeager v. Bowlin* (9th Cir. 2012) 693 F.3d 1076, 1082, quoting *Christoff*, *supra*, 47 Cal.4th at p. 477.)

C.  Background

At trial, Respondents offered an instruction on the statute of limitations, which addressed the issue of republication.  Appellants objected to that proposed instruction and offered two instructions regarding the statute of limitations.  The parties addressed their concerns regarding these instructions with the trial court.

Respondents argued that Appellants were required to prove that the labels used after June 22, 2014 (two years before the filing of the original complaint), were "identical in form and content" to those used before that date.  Respondents asserted that, any modification, even if it did not involve the way in which Hubert's name and story were used, would mean the label had been "republished," creating a new cause of action.

Appellants' instructions were based on section 3425.3 and CACI No. 338.  Appellants insisted that Respondents' proposed instruction erroneously required Appellants to prove that the labels were "identical" before and after June 22, 2014, and also that they were "never modified" and "never reprinted" after that date.  Finally, Appellants argued that the last paragraph of Respondents' instruction was improper because it concerned

42

efforts to "continue, renew, or expand" use of labels and used language directly from Justice Werdegar's concurrence in *Christoff*. The trial court ruled that it would give both of Appellants' proposed instructions and Respondents' proposed instruction (except for the last paragraph).

When the court instructed the jury, therefore, it first read what had been Appellants' Special Instructions 13 and 14, as follows:

> "No person shall have more than one cause of action for damages for misappropriation of the right of publicity founded upon any single publication or exhibition or utterance.

> "The [Appellants] contend that the [Trust's] lawsuit was not filed within the time set by law. To succeed on this defense, the [Appellants] must prove that the [Appellants'] use of Hubert Hansen's name was a single publication that first occurred prior to June 22, 2014.

The trial then also read Respondents' Special Instruction 3, as follows:

> "[Appellants] contend that the [Trust's] lawsuit was not filed within the time set by law. To succeed on this defense, Appellants must prove all of the following:

> "First, that [Appellants]' use of Hubert Hansen's name on products or for purposes of advertising or selling products first occurred prior to June 22, 2014.

> "Second, the designs of the labels that [Appellants] used on products sold before June 22, 2014, were identical in form and content to the designs of the labels that [Appellants] used on products that were sold after June 22, 2014.

> "Third, [Appellants] never modified the product labels after June 22, 2014.

> "And fourth, that the [Appellants] never reprinted any product labels after June 22, 2014.

43

"Additionally, for any use of Hubert Hansen's name for purposes of advertising or selling products that did not involve use of the name on products, the [Appellants] must prove that use made after June 22, 2014, was identical in form and content to the use made before June 22, 2014."

### D.  Standard of Review and Relevant Law

"We review de novo the question of whether the trial court's instructions to the jury were correct." (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)  "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)  Thus, when a proposed instruction correctly states the law, and there is evidence to support it, a trial court commits error if it refuses to give it.  (*Id.* at pp. 573-574.)

However, "there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission.  A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule, supra*, 8 Cal.4th at p. 580; see Cal. Const., art. VI, § 13.)  In evaluating whether instructional error is prejudicial, we consider "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, at pp. 580-581, fn. omitted; see *Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1156.)

44

## E. Analysis

Neither party argues that the court erred in providing the two special instructions offered by Appellants concerning the statute of limitations. The jury instruction challenged here is limited to Special Instruction No. 3 offered by Respondents. Appellants claim that the instruction erroneously required them to prove that labels after June 22, 2014, were identical to those produced before the date in order to prevail on their statute of limitations affirmative defense. In addition, Appellants maintain that Special Instruction No. 3 improperly incorporated the concurring opinion from *Christoff*, *supra*, 47 Cal.4th 468. As that case is the only published California opinion dealing with product labels and the single-publication rule, we begin our analysis with a review of *Christoff*.

In *Christoff*, the plaintiff, a professional model, was paid $250 to pose for a photograph to be used in Canada on a label for bricks of coffee. Sixteen years later, the plaintiff saw his face on a jar of Taster's Choice instant coffee in the United States and discovered his image had been used without his consent on millions of labels sold internationally for the preceding five years. (*Christoff*, *supra*, 47 Cal.4th at p. 471.)

The plaintiff filed suit for appropriation of his likeness, among other claims, six years after the defendant began using his image but a year after his discovery. The trial court applied a two-year statute of limitation and instructed the jury to determine under the discovery rule whether the plaintiff knew or should have known earlier that the defendant had used his image. The jury found that the plaintiff did not know and should not have reasonably suspected that his image was being used without his consent. The jury awarded the plaintiff more than $15 million in damages. (*Christoff*, *supra*, 47 Cal.4th at p. 471.)

45

The Court of Appeal reversed, determining that, under the single-publication rule, the plaintiff's claim was time-barred because he had not filed his lawsuit within two years of when the defendant first published the label containing his image. The appellate court instructed the trial court, on remand, to consider whether the defendant had hindered the plaintiff's discovery of the use of his image or that the label had been republished. Either finding could defeat the defendant's statute of limitations defense. (*Christoff, supra*, 47 Cal.4th at p. 472.)

Our high court granted review. It agreed with the Court of Appeal that the single-publication rule applied to the plaintiff's claim. However, the Supreme Court disagreed with the Court of Appeal's opinion to the extent it presumed that the defendant's various uses[19] of the plaintiff's likeness, including its production of the product label for a five-year period, necessarily constituted a " 'single publication' " within the meaning of the single-publication rule. (*Christoff, supra*, 47 Cal.4th at p. 472.) The court explained:

> "We agree that, in general, the single-publication rule as codified in section 3425.3 applies to causes of action for unauthorized commercial use of likeness, but in order to determine when the statute of limitations was triggered for

---

[19] The defendant " 'youthened' " the plaintiff's photograph to make him appear younger. It used the plaintiff's image on a redesigned label beginning in 1998. (See *Christoff, supra*, 47 Cal.4th at p. 473.) The redesigned label was used on "several different Taster's Choice jars, including regular coffee, decaffeinated, and various flavors." (*Ibid*.) The plaintiff's image was used on labels printed in different languages and placed on jars of coffee sold internationally. For at least one of the labels, the plaintiff's image was further altered to add sideburns and darken his complexion. Moreover, images of jars of coffee with the plaintiff's image appeared in various advertising campaigns, including transit ads, magazine advertisements, coupons in newspapers, and advertisements on the internet. (*Ibid*.)

46

> [the plaintiff's] action, we must decide whether [the defendant's] unauthorized use of [the plaintiff's] image, including its production of the label, constituted a "single publication" within the meaning of the single-publication rule."

(*Id.* at p. 476.)

However, the record before our high court was insufficient to allow it to engage in the necessary inquiry. (*Christoff*, *supra*, 47 Cal.4th at p. 476.)

The court made clear that to apply the single-publication rule, a court must first identify what constitutes a " 'single integrated publication' " within the meaning of the rule. (*Christoff*, *supra*, 47 Cal.4th at p. 477.) It offered examples of qualifying publications, like "the printing and distribution of a particular issue of a newspaper, magazine, or book." (*Ibid.*) But it noted: "Whether the printing of a product label over a five-year period constitutes a single integrated publication within the meaning of the single-publication rule is an issue of first impression in this state." (*Ibid.*)

Our high court also indicated that the matter before it was further challenging because of the various ways in which the defendant used the plaintiff's image. The court observed:

> "In addition to producing the product label, [the defendant] also used [the plaintiff's] likeness in other forms, including transit ads, coupons in newspapers, magazine advertisements, and Internet advertisements. This raises questions whether each of these activities constituted a 'single integrated publication,' whether the entire advertising campaign should be considered a 'single integrated publication,' or whether [the defendant's] first use of [the plaintiff's] image triggered the running of the statute of limitations for all subsequent uses in whatever

47

form.  These are important questions, and there is little authority to turn to for guidance."

(*Christoff*, *supra*, 47 Cal.4th at p. 477.)

In further explaining why existing law did not provide sufficient guidance for the issue before it, the court acknowledged that production of a product label is different than publishing an issue of a newspaper or magazine or an edition of a book, with each of the latter examples constituting "a discrete publishing event."  (*Christoff*, *supra*, 47 Cal.4th at p. 481.)  The plaintiff argued that the defendant's conduct qualified as a continuing wrong, and, as such, a new cause of action accrued with each wrongful act.  In contrast, the defendant maintained that its use of the plaintiff's image on its product label was a " 'single overt act' " with " 'a continual effect that is relevant to damages, but does not denote a continuing course of conduct for which the limitations period can be tolled.' "  (*Id.* at p. 482.)

The court ultimately remanded the matter so that an adequate factual record could be made to address the new issues presented under the single-publication rule.  Yet, it set forth the type of factual record it would need to address the issue before it.  (*Christoff*, *supra*, 47 Cal.4th at p. 482.)

In her concurring opinion, Justice Werdegar agreed that the court could not determine whether the statute of limitations had run on the plaintiff's claim without a better factual record, but she believed "some general principles relevant to that question may be discerned from the language of section 3425.3."  (*Christoff*, *supra*, 47 Cal.4th at p. 483 [conc. opn. of Werdegar, J.].)  To this end, Justice Werdegar focused on "the broadest question posed" in the appeal:  "[W]hether *all* distribution of labels employing

48

the original misappropriated image, whenever they occurred, should be deemed to constitute a single publication for purposes of section 3425.3."[20] (*Ibid.*)

After acknowledging that California courts had not addressed the issue, Justice Werdegar discussed a line of out-of-state cases that concluded "multiple broadcasts, distributions or displays of identical material constitute a single publication for purposes of the statute of limitations, and not a serious of republications." (*Christoff*, *supra*, 47 Cal.4th at p. 484 [conc. opn. of Werdegar, J.].) Then she discussed other out-of-state decisions that reached the opposite conclusion. (*Ibid.*) Of the two different approaches, Justice Werdegar believed the latter approach was more consistent with the statutory language of section 3425.3, which illustrates as a single publication " 'any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture.' " (*Christoff*, at p. 484, quoting § 3425.3.) She stated that the statute "dictates we treat as a separate publication any reissue, rebroadcast or reexhibition, even though the publication's contents or the manner of its distribution or display has not been changed." (*Ibid.*)

Justice Werdegar discussed the difficulties of determining what constituted a single " 'issue' " of printed material but suggested a useful distinction could be to focus on a republication decision that is " ' " 'conscious [and] independent' " ' [citation] or 'conscious and deliberate' [citation]."

---

[20]    Although Justice Werdegar focused on this broad issue, she implied that labels on which the plaintiff's image was significantly altered and advertisements that employed photographs of the label would constitute separate publications from the original labels themselves. (*Christoff*, *supra*, 47 Cal.4th at p. 483, fn. 2 [conc. opn. of Werdegar, J.].)

(*Christoff*, *supra*, 47 Cal.4th at p. 485 [conc. opn. of Werdegar, J.].) She then noted that when a publisher set up a "more or less automated system for printing and distributing an item . . . and does not make a separate publishing decision as to each copy or small batch of copies, to call each such distribution a new 'issue' of the material would defeat the purposes of the single publication rule." (*Ibid*.) Yet, she believed a republication would occur and thus a new cause of action accrue "where a publication has been out of print . . . for some time and the publisher makes a conscious decision to reissue it[.]" (*Ibid*.)

Based on the guidelines she described, Justice Werdegar doubted that the "defendant's entire five-year course of printing and distributing labels may be deemed a single publication simply because the labels were not substantially altered during that time." (*Christoff*, *supra*, 47 Cal.4th at p. 486 [conc. opn. of Werdegar, J.].)

Although the majority opinion in *Christoff*, *supra*, 47 Cal.4th 468 provides little help to address Appellants' challenge to Special Instruction No. 3 in the instant action, it nevertheless provides some general parameters in which to consider the issue. For example, the court noted: "The single-publication rule is intended to prevent a 'single integrated publication' from resulting in numerous causes of action because the publication is received by a mass audience." (*Id*. at p. 480.) Thus, it is not surprising that the court suggested the first task in applying the single-publication rule is to identify what constitutes a " 'single integrated publication.' " (*Id*. at p. 477.) It did not answer this question regarding the product labels and advertisements at issue in *Christoff*, but it recommended that on remand, the parties create "a sufficient factual record that reveals the manner in which the labels were produced and distributed, including when production of the labels began and

50

ceased." (*Id.* at p. 482.)  Because Appellants had the benefit of this guidance from *Christoff*, we assume they would have sought to create "a sufficient factual record below."  However, that record, if it exists, is not presented in Appellants' briefing.  Such evidence would have been helpful to determine what constituted a single integrated publication in the context of the production of product labels.  Perhaps, Appellants created such a record, but it is not our role to comb through the record to make arguments that might be helpful to Appellants' position.  (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

In addition, our high court emphasized in *Christoff* that if it were determined on remand that "all or some portion of the production of the label constituted a single integrated publication, then the superior court should further consider whether the statute of limitations began anew because the label was 'republished' within the meaning of the single-publication rule." (*Christoff*, *supra*, 47 Cal.4th at p. 482.)  Given this statement by the Supreme Court coupled with Respondents' stated purpose with Special Instruction No. 3 to encompass republication of product labels, we are surprised that Appellants did not provide any discussion, based on the factual record below, regarding what should be considered a republication in terms of the product labels at issue.  In addition, although we agree that Justice Werdegar's concurrence is not the law in California, it does offer suggestions that could have guided Appellants' discussion of the evidence as well as determining what constitutes a single integrated publication and republication in the context of the production of product labels.  Yet, Appellant engaged in no such discussion of how the facts of this case support or undermine Justice Werdegar's approach to the issue beyond making the correct observation that

51

her concurrence is not the law. However, as the parties point out, the law regarding the application of the single-publication rule to product labels is undeveloped in California, and the prudent tactic (for Appellants) would have been to explain why we should not accept Justice Werdegar's guidance under the facts of this case.

Finally, in *Christoff*, the Supreme Court indicated that the defendants had used the plaintiff's images on more than just product labels. Thus, the court stated that, on remand, the parties needed to explore whether the defendant's use of the plaintiff's image in various forms of advertising constituted a single integrated publication and when the statute of limitation was triggered for the different types of advertising. (*Christoff*, *supra*, 47 Cal.4th at p. 482.) Here, it appears Appellants used Hubert's name and story on more than just product labels, but they do not address these additional uses in any meaningful way.

Instead of presenting their argument through the lens suggested by *Christoff*, Appellants argument is little more than the bald assertion that Special Instruction No. 3 is an incorrect statement of the law. Specifically, they challenge the fact that the instruction requires them to prove that the labels used after June 22, 2014 (the cut-off date) were "identical in form and content" to the labels used before that date. Appellants argue there is no support for such a stringent requirement under California law. Although we agree that there is no California case establishing that such language is required in a jury instruction regarding the single-publication rule in a product labeling case, we can find suggestions in California law supporting such language.

For example, Respondents maintain they used the words "identical" as well as "never modified" in Special Instruction No. 3 to capture a new

52

publishing decision. In other words, if Appellants changed the label in any way after June 22, 2014 or reprinted product labels after that date, then such action would constitute a new publishing decision, which would constitute a new "single publication" or a republication. Thus, the language Respondents proposed for Special Instruction No. 3 appears to somewhat track the language in section 3425.3 that limits the number of causes of action for libel, slander, or invasion of privacy that can be brought on "any single publication . . . such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." (§ 3425.3.) The single-publication statute therefore implies that if a newspaper, book, magazine, broadcast, or movie was altered and then offered to the public then the single-publication would not prohibit a new cause of action based on the altered publication. Indeed, at least one case has supported such an approach to the application of the single-publication rule where the allegedly tortuous statement remained unchanged despite appearing multiple times in different newspaper editions. (See *Belli v. Roberts Bros. Furs* (1966) 240 Cal.App.2d 284, 288-289 (*Belli*) [holding that the February 14, 1962, issue of the San Francisco Chronicle Newspaper, which was composed of six editions that were issued over a two-day period was a "single, integrated publication" and noting the allegedly defamatory material appeared in the first edition and "was repeated without change in each and every addition that followed"].)

However, the single-publication rule, under certain circumstances, may not prohibit a new cause of action even when the content of the publication remains the same. In *Kanarek v. Bugliosi* (1980) 108 Cal.App.3d 327 (*Kanarek*), the appellate court concluded that the plaintiff could pursue his

libel claim arising out of statements contained in the paperback republication of a previously released hardcover book.  The court determined that, while the allegedly libelous material was identical in form and content to the original hardcover edition, the republication in paperback form was "undoubtedly intended to and did reach a new group of readers" and thus gave rise to a new cause of action for libel.  (*Id*. at p. 333.)  This case suggests that the single-publication rule does not bar a suit based on a separate publication of the same material as long as the publication was intended and released to reach a different audience (e.g., in format or price).  So, the publication of the identical book in a paperback edition represented a new publication decision.  As such, *Kanarek* connotes that, at least in the publication of books, a new publication that is identical in content to a previous publication may still give rise to a new cause of action under the single-publication rule.

Thus, *Belli* and *Kanarek* illustrate that the single-publication rule can apply differently depending on the type of publication.  For the publication of a newspaper, despite the libelous content being printed in six different editions, the fact that the offending content remained the same in each addition was sufficient to trigger the single-publication rule and limit the number of causes of action that could be brought.  (See *Belli*, *supra*, 240 Cal.App.2d at p. 289.)  Yet, when the defendant published the same offending content in a paperback book as had been previously published in a hardback format, the court determined that the single-publication rule did not bar a new cause of action based on the paperback publication.  (See *Kanarek*, *supra*, 108 Cal.App.3d at p. 333.)  In light of these cases, here, it would have

been helpful had Appellants explained how the publication of product labels is like or different than the publication of newspapers or books. Unfortunately, they did not do so.

This shortcoming is all the more fatal to Appellants' challenge to Special Instruction No. 3 because, as our high court informs us in *Christoff*, the single-publication rule is heavily context dependent. (See *Christoff, supra*, 47 Cal.4th at p. 482 [without knowing "the manner in which the labels were produced and distributed, including when production of the labels began and ceased," the court could not determine whether there was a single integrated publication].) Appellants have not informed us, with citations to the record, about the process they used for designing and printing their product labels, including who was involved, when they were printed and by whom, and whether the process was automated or involved human decision-making. Indeed, Appellants have not even attempted to articulate a discussion that would enable us to understand what the evidence showed at trial regarding the context in which the labels were produced. Consequently, we cannot determine whether labels that were not identical in form and content resulted in what could reasonably be construed as a new and distinct publication. In short, without a more robust discussion of the factual record as it relates to Appellants' production of labels, advertising, and marketing, we cannot conclude Special Instruction No. 3 was legally erroneous or provide further guidance regarding what such an instruction should entail. (See *Christoff, supra*, 47 Cal.4th at p. 482, quoting *Lahr v. Adell Chemical Co.* (1st Cir. 1962) 300 F.2d 256, 260 [" 'Whether the single publication rule should be applied to the circumstances of this case had best be decided when we know what they were.' "].) That said, on remand, the parties would be well advised

to consider how *Christoff*, *Belli*, and *Kanarek* relate to the specific production of product labels at issue here and fashion a republication jury instruction accordingly.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the superior court. The superior court is instructed to vacate the judgment and set a new trial date. The parties are to bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

DO, J.